PITCHFORK RANCH COMPANY, a
Wyoming Corporation, Appellant
(Defendant),

v.

The BAR TL, a Wyoming Corporation,
Appellee (Plaintiff).

No. 5259.

Supreme Court of Wyoming.

Aug. 18, 1980.

Lawrence A. Yonkee and Tom C. Toner of Redle, Yonkee & Arney, Sheridan, and Ernest J. Goppert, Jr., and Richard W. Day of Goppert, Day & Olson, Cody, for appellant.

William H. Brown, Jr., and Claude W. Martin of Brown, Drew, Apostolos, Massey & Sullivan, Casper, and Charles G. Kepler and L. B. Cozzens of Simpson, Kepler & Cozzens, Cody, for appellee.

Before RAPER, C. J., and McCLIN-TOCK, THOMAS, ROSE and ROONEY, JJ.

ROSE, Justice.

## OVERVIEW

This appeal from a summary judgment has, as its task, the resolve of the question which asks whether or not the Bar TL Ranch near Meeteetse, Wyoming, was sold to the highest lawful[1] bidder at an auction sale in 1978—and if it was not, were the sale representations, relevant agency au-

---

1. We continue throughout this opinion to use the term "highest *lawful* bid or bidder" because, while it is obvious that the Pitchfork bid of $1,600,000.00 is arithmetically lower than the purported Florance bid of $1,610,000.00, the appellant contends that Florance did not—

thorities, and the applicable legal concepts such as to render unnecessary that the ranch be knocked down to the person submitting the highest bid. The pleadings indicate that both parties valued the ranch, at the time of sale, to be $4,000,000.00.[2] In the face of an uncontroverted affidavit of one Ronald Florance, wherein he deposes and says that he bid $1,610,000.00 for the property, Pitchfork argues the ranch was sold to it for $1,600,000.00. For what is alleged to be good and valuable consideration, Bar TL was assigned the Florance rights arising out of the sale before its quiet-title suit was filed.

On July 1, 1978, the subject lands were submitted to the public auction block at the Bar TL Ranch in Park County, Wyoming. The auction was advertised widely as an absolute auction with *no reserves* and no minimums. Kennedy & Wilson Auctioneers conducted the auction.

At a certain juncture in the proceedings, the whole of the Bar TL Ranch lands and leases was offered as an entity on a lump-sum basis. Pitchfork bid $1,600,000.00. It is Pitchfork's position that the record reveals its bid to be the highest—at least the highest within the rules of the sale and the law applicable thereto—or, alternatively, there is an issue of fact on the question of who submitted the highest lawful bid and, therefore, the entry of summary judgment in favor of Bar TL and the denial of summary judgment on Pitchfork's counterclaim was error.

Appellee-Bar TL argues that since this auction was advertised as a no-reserves

sale, all parties are bound to the legal consequences attendant upon such sale, including the collateral-contract theory which holds that the only valid sales agreement capable of evolving from a no-reserves auction is one in which *the seller becomes the offeror* through no-reserve presale representations and *only the highest bidder is capable of accepting the offer.* Therefore, argues Bar TL, a purported contract between a seller and a bidder, other than the one submitting the highest bid in a no-reserves auction, is void for all purposes.

In response to the seller-Bar TL's suit to quiet title, the district judge entered summary judgment in its favor, thereby deciding that the ranch property was not sold to the highest bidder as required by public sales advertisements, agreements between and among the parties and those concerned, and the applicable law, and, furthermore, there was no question of fact on this issue. The court also denied Pitchfork's motion for summary judgment on its counterclaim for specific performance.

### Issue

The appellant identifies, among others, the following issue for our consideration:

"Is there a genuine issue of material fact as to whether Florance ever made a bid or attempted to make a bid in excess of the Appellant's bid?"[3]

### Holding

It is unnecessary for us to reach other issues called up by the appellant since we

under both fact and applicable law—submit a later bid in a manner which would qualify it as a legitimate high bid which binds the seller to a sales contract.

2. Pitchfork Ranch alleged in its counterclaim to the Bar TL's suit to quiet title that as a result of Bar TL's breach of contract, Pitchfork suffered various damages, including a damage of $2,400,000.00, which was the "difference between the actual market sale value of the properties" and the $1,600,000.00 auction price. In its appellee's brief, Bar TL also uses a market value on the date of the auction of $4,000,000.00 for the ranch.

3. We are compelled to observe that the appellant confines the issue here more narrowly

than we are willing to do. It says the only issue of fact is whether or not Florance *made* a higher bid than the Pitchfork offer, urging that the fact issue is formulated by the auctioneer's opposing testimony that he did not *receive* a bid higher than the one made by Pitchfork. We do not find that this testimony constitutes a fact issue which will defeat appellee's motion for summary judgment. A search of the record reveals—as we will discuss in detail—that there is no issue of fact on the question of whether Florance made a higher offer—*he did.* There is also no question of fact upon the question of whether or not the auctioneer personally *received* a higher bid—*he did not*—at least, in the context that his floorman did not convey the Florance bid to him. These propo-

will affirm the trial court's conclusion that the property was not sold to the highest bidder as required by law.[4] In reaching our decision, we will hold that Pitchfork did not consummate a contract of sale with Bar TL by reason of the bidding at the public auction in question here.

## FACTS

The Bar TL, Kennedy & Wilson Auctioneers, Melvin C. McGee, broker, and George J. McWilliams, d/b/a George J. McWilliams

Real Estate Auction Company, executed a listing agreement effective April 7, 1978, under the terms of which the Bar TL listed its real and personal property for sale at public auction. This agreement contained the following relevant paragraphs:

"2. Said ranch properties will be sold at absolute public auction [5] on July 1, 1978 unless later by mutual consent. The properties may be offered in parcels or as an entirety as agreed by the parties.

\*    \*    \*    \*    \*    \*

sitions are assumed by us to be uncontroverted facts as shown by the record. However, in order for us to reach a decision which will be dispositive of the summary-judgment issues, a broader range of facts and law than those identified by the appellant must be brought into play. These facts and concerns of law will reveal themselves in the course of the opinion.

4. We are comfortable in our selection of the only *factual* issue for decision because the appellant certified as much to the trial court at the hearing on the motions for summary judgment. In this regard, the following dialogue took place between the judge and the appellant's counsel:

"THE COURT: I would like for you to tell me what issues of fact, you said there were some issues of fact not resolved. What are they? Would you like some time to think about that?

"MR. YONKEE: No, sir. The one issue of fact, your Honor, that we think is not resolved is whether or not Mr. Florance made a bid.

"THE COURT: He said he did in his affidavit, didn't he?

\*    \*    \*    \*    \*    \*

"MR. YONKEE: That's true. He says that.
"THE COURT: Under oath.
"MR. YONKEE: Right, but the auctioneer who conducted the auction has testified that the highest and best bid he received was $1,600,000 that came from bidder number 133.

"THE COURT: My recollection is and from those depositions, that one of them said he didn't recall.

"MR. YONKEE: That's right.
"THE COURT: But there could have been.
"MR. YONKEE: There might have been.
"THE COURT: And Florance says he did.
"MR. YONKEE: Right.
"THE COURT: All right, but you say that's an issue of fact, then?

"MR. YONKEE: There is an issue of fact on what Mr. Florance did.

"THE COURT: In other words did Florance bid more than $1,600,000?

"MR. YONKEE: Yes, than Pitchfork.

"THE COURT: That's one issue. What's another issue?

"MR. YONKEE: That's it, your Honor. . . ."

5. The auctioneers had a clear understanding of the meaning of the term "absolute auction." Mr. William Robert Stevenson, President of Kennedy & Wilson Auctioneers, engaged in this deposition dialogue with counsel:

"Q. In your involvement with the auctioning business, do you have an opinion as to what it means when you say you are going to have an absolute auction?

"A. Yes.

"Q. What is that?

"A. It means that there will be no minimum bids. In other words, whatever someone wishes to open the auction at, the auctioneer is required to accept that bid. And it means that whatever the final highest bid is, the seller is expected to accept that as the highest price paid and sell whatever it was that was being sold at that price."

The joint adventurer—with KW—Mr. John Patrick Wilson—knew what an "absolute auction" was when he testified by deposition:

"Q. This term 'absolute auction' is used, I believe, in your contract listing agreement. If it goes for $5, it goes.

"A. No minimum, no reserves, or absolute; there's no ceiling on it.

"Q. And were these bids that come in subject to anyone's approval?

"A. No.

"Q. Final approval?

"A. No.

"Q. And is that part of the meaning of this term 'absolute sale'?

"A. Absolutely. What it went for is what it went for."

On direct deposition examination, Auctioneer Kennedy testified, with reference to an ad in the Billings, Montana Gazette:

"Q This contains—the line at the top, and I'm quoting 'absolute auction.'

Do those words—first, let me ask you if you know if those words have any special meaning in the auction sale of property?

"10. *KW* [auctioneer] *and broker agree* that the preparing, promoting, publicizing, organizing and consummating the sale shall be conducted strictly in accordance with Wyoming and other applicable laws and regulations; *that they and their respective companies and personnel will use their best efforts to obtain buyers who will pay the highest prices obtainable at the public auction. . .*

"a. *auctioneers will be responsible for . . . all matters relating to the public auction elements of the sale including the auctioneering, clerking and overall organization and procedure at the sale.*

\* \* \* \* \* \*

"d. in accordance with Wyoming law, rules and regulations all matters in connection with the sale and its promotion will be under the direct supervision of broker and broker will have full responsibility therefor.

"11. *Each party agrees to work closely with the other in all matters and activ-*

"A Yes. Absolute would mean—
"Q All right. Tell us what that meaning is.
"A 'Absolute' would mean that it's just as it says; it's an absolute sale, that it sells. There are no minimums; *there are no reserves.*
"Q Is the language 'no minimums' on that ad?
"A 'This no-minimum auction includes.' Right.
"Q Are the words 'no minimum,' is that language that's used in connection with the auction sale of property?
"A Anywhere that you go in the United States, they would know what that meant.
"Q And what about the term 'absolute auction'?
"A 'Absolute auction' is a term that would be known.
"Q What about the term 'no minimum' What does that mean?
"A That means that the property or goods to be offered have no minimum price. *That they sell to the last and highest bidder.*
"Q Is that a kind of auction sale that would be distinguished from some other types of auction sales?
"A Some auction sales would have reserves, and when they do have reserves, they put on their advertisement 'reserves.'
"Q What does 'reserves' mean?

*ities involving preparation, publicizing, organizing and conducting the sale in order to obtain the highest price for the properties.*" (Emphasis and parenthetical matter supplied.)

A letter from Donald Kennedy, of Kennedy & Wilson Auctioneers, circulated to prospective bidders, including Pitchfork [6], contained the following language:

"Jerry Housel, a Cody Wyoming attorney and long time rancher is retiring. His hugely successful, 70,000 acre BAR TL RANCH properties will be offered at public auction by KENNEDY & WILSON AUCTIONEERS, INC., of Los Angeles, California in cooperation with George McWilliams, Auctioneer, Bozeman, Montana. *There will be no minimums and no reserves.* The auction will take place at the BAR TL RANCH, just south of Cody, Wyoming on Saturday, July 1, 1978 at 12:00 Noon."

Advertising placed in newspapers worldwide represented the sale as an "absolute no minimum auction." [7]

"A That means that you have a minimum price that you must reach before they sell the item that's being offered.
"Q What does 'no minimum' mean?
"A *'No minimum' means that there are no reserves. It's an absolute auction, that you can sell it for whatever the highest bidder pays for it.*" (Emphasis supplied.)

6. The Pitchfork Ranch directors knew the sale was a no-reserves sale, as this knowledge is reflected in the meeting of the Board of Directors as of June 27, 1978, where an excerpt from the minutes reveals the following:

"The next item of business to come before the meeting concerned the upcoming sale of the Bar TL lands. The various information concerning this sale which had been passed out by the owners was gone over. The ranch is to be bid on in four parcels separately and then the property is to be offered as a whole. *It was noted that the highest bid offered would be accepted as the sale was being offered without reserves or minimums.*" (Emphasis supplied.)

7. We agree with appellant's analysis of the term "no minimums," as such is contained in its brief to this court, where it is said:

"c. *The phrase 'no minimums' refers to opening bids and not to increments in the bidding.*

In the "Receipt and Sales Agreement," which was never signed by Jerry Housel, the president of Bar TL, but which was signed after the auction by Vice President and Manager, Jack Turnell, for Pitchfork, the following appears:

"6. *seller's representations.* Buyer makes this agreement in full reliance upon his independent investigations and judgment. There are no verbal or other agreements or representations which modify or affect this agreement and items are purchased as is. *All representations made by The Bar TL or any of its brokers, agents, employees or representatives in negotiating or conducting the sale are incorporated herein.*" (Emphasis supplied.)

The record makes the following undisputed facts available to our consideration in a summary-judgment appellate context:

(1) The auctioneer, Kennedy, as agent for Bar TL, the seller, was obligated by contract to employ his best effort to sell the ranch to the *highest bidder.*[8]

(2) Auctioneer Kennedy had agreed with seller to conduct a no-reserves auction.

> "The Appellee contends that the phrase 'no minimums' meant that the auctioneer could not impose increments in the bidding. In fact the record indicates that the term 'no minimums' has nothing to do with the bidding increments. It simply means that there is no minimum price on the items put up for sale, *i. e.,* the right to withdraw the item if it does not bring a certain minimum price. (Stevenson dep. 31–33) For example, at this sale not only land, but minerals, livestock and machinery were also being sold. Therefore, there was no minimum prices on any of the items put up at the auction.
>
> "It is clear that in the auction trade the term 'minimum' refers to a price floor. Cassady, *Auctions and Auctioneering,* Ch. 16 (Univ. of Cal. Press 1967). It has nothing to do with the amount of the advance or increment by which the bid continues.
>
> \* \* \* \* \* \*
>
> Hewitt, *All About Auctions* 113 (Chilton Book Company 1975).
>
> "As understood by the auctioneering industry, the term 'no minimums' does not limit the auctioneer's authority to determine advances or increments in the bidding."

In this context, we understand the term "no minimums" to be synonymous with the term "no reserves."

(3) All bidders (including Pitchfork) were informed that this was a "no-reserves" auction.

(4) Before the hammer fell, knocking down the ranch to Pitchfork, Ronald Florance made a bid by placing it with a floorman who was an auction official acting with and in behalf of the auctioneer.[9]

(5) The Florance bid was for $1,610,-000.00, which was $10,000.00 higher than the $1,600,000.00 previously bid by Pitchfork.

(6) Prior to and after the Pitchfork and Florance bids, the auctioneer had announced the bids would be confined to $25,-000.00 minimum increments.

(7) Jerry Housel, president and principal officer of Bar TL, had not given Kennedy authority to adopt a minimum-increment policy, the effect of which would serve to preclude contracting with the highest bidder, and had no knowledge of the $25,000.00 increment policy invoked by Kennedy.

(8) Florance had not heard the auctioneer's minimum-increment announcement.

8. While contending that in point of fact he knocked the property down to the highest bidder (Pitchfork), Kennedy explains this in the following way:

> "Q. So it's your opinion that in this particular case, the highest bidder was not the highest bid made, but the highest bid that you accepted, or purported to accept?
> "A. That's correct."

9. We said in *State v. State Board of School Land Comm'rs,* 27 Wyo. 54, 191 P. 1073, 1074 (1920):

> ". . . A bid may be made orally, or in writing, by a wink or a nod, or by any mode by which the bidder signifies his willingness and intention to give a particular price (2 R.C.L. 1125), or by words spoken privately to the auctioneer (*Millingar v. Daly,* 56 Pa. 245), or by letter (*Tyree v. Williams,* 3 Bibb [Ky.] 365, 6 Am.Dec. 663; 6 C.J. 829). . . ."

Since the floormen were the agents of the auctioneer, placed strategically throughout the crowd for the purpose of receiving bids, we place no importance upon any contention that a bid given to the auctioneer's floorman was not "received" by the auctioneer.

(9) The auctioneer, Kennedy, had a pre-auction understanding with his floormen which would preclude a bid as low as a $10,000.00 increase being communicated to him.

(10) Housel had no knowledge of this intramural arrangement among the auctioneers and at all times relevant hereto believed the sale was being conducted as a no-reserves auction—that is—an auction from which he could not withdraw his property once the bidding had commenced.

(11) Because of his $25,000.00 increment policy, Kennedy would not have knocked the property down to Florance for $1,610,-000.00 even if he had heard the bid or it had otherwise been communicated to him.[10]

(12) Ronald Florance has assigned to Bar TL any interest that he acquired as a result of his bid for the property.

While the above enumerated facts stand uncontroverted in the record—the only ones essential to our decision herein are: (a) the auction was advertised as a no-reserves sale; and (b) there was a higher bid than that made by Pitchfork.

## THE LAW

Preliminarily, we restate the now-familiar law of summary judgment, in compliance with which we must decide this appeal.

### The Law of Summary Judgment

We summarized the law of summary judgment in *Timmons v. Reed*, Wyo., 569 P.2d 112, 115–116 (1977), when we said:

"Upon reviewing the record on appeal from the granting of summary judgment,

" '. . . we have exactly the same duty as the trial judge and, assuming the record is complete, we have exactly the same material and information in front of us as he did. . . .'

*Seay v. Vialpando and Anderson*, Wyo., 567 P.2d 285, 287; *Hunter v. Farmers Insurance Group*, Wyo., 554 P.2d 1239, 1244, and *Knudson v. Hilzer*, Wyo., 552 P.2d 680, 685.

We inquire from the viewpoint most favorable to the party opposing the motion. *Seay v. Vialpando*, supra; *Tri-State Oil Tool Industries, Inc. v. EMC Energies*, Wyo., 561 P.2d 714, 717; *Shrum v. Zeltwanger*, Wyo., 559 P.2d 1384, 1387; *Bluejacket v. Carney*, Wyo., 550 P.2d 494, 497. The moving party in a summary judgment proceeding has the burden of showing the absence of a genuine issue of material fact. *Mealey v. City of Laramie*, Wyo., 472 P.2d 787, 792; *Kover v. Hufsmith*, Wyo., 496 P.2d 908, 910, and *Gilliland v. Steinhoefel*, Wyo., 521 P.2d 1350, 1352. When there are genuine issues of material fact, the summary judgment should not be granted. *Knudsen v. Hilzer*, supra, and *Johnson v. Soulis*, Wyo., 542 P.2d 867, 871–872. . . ."

To these rules of law, appellant would have us invoke the notion that the court is obligated to view the testimony of the witnesses in the light most favorable to the appellant—which we do—and we agree that we must take as true all facts asserted by the appellant which are supported by the evidence. *Reynolds v. Tice*, Wyo., 595 P.2d 1318, 1320 (1979); and *Trautwein v. Leavey*, Wyo., 472 P.2d 776, 778 (1970).

It becomes necessary, therefore, to call upon the law of auctions and auctioneers to see if Bar TL and Pitchfork entered into a binding contract of sale.

## AUCTIONS AND AUCTIONEERS

### What is an Auction Sale?

The legal definition of an auction is "a public sale of property to the highest bid-

---

10. Kennedy does not deny that Florance made a higher bid—all he can say is that "to my knowledge" nobody made a higher bid. The relevant question-and-answer scenario goes like this:

"Q. Secondly, can you say for sure that nobody did attempt to make a bid for $1,610,-000?

"A. To my knowledge, nobody. And that's all I can say. I do not know that

anybody attempted to make a million six hundred ten thousand dollar bid. I already stated my position to the crowd, that nothing less than $25,000 increments would be accepted so—

"Q. But you don't know for a fact that nobody did?

"A. Yes, that's right."

der." The popular concept of an auction is identical to the legal definition of an auction. Webster's Third New International Dictionary; and *Brewer v. Cowan*, 220 La. 189, 56 So.2d 149, 150 (1951).

■ It is said in 7A C.J.S. Auctions & Auctioneers § 2, p. 853:

"An auction is a public sale of property to the highest bidder, by one licensed and authorized for that purpose. The main purpose of auction sales is to obtain the best financial returns for the owner of the property sold; and they are based on the purpose and policy of obtaining the worth of property by free and fair competition among the bidders. . . ." (Footnote references omitted.)

It is said in 7 Am.Jur.2d, Auctions and Auctioneers, § 1, p. 360:

"The custom of selling goods at auction is as old as the law of sales. An auction, as usually defined, is a public sale of property to the highest bidder. Competitive bidding is an essential element of an auction sale; hence, any agreement unfairly restrictive of that opportunity is against public policy and void, . . ." (Footnote references omitted.)

### *Offer and Acceptance—With Reserve Auctions*

It is said in 7 Am.Jur.2d, § 16, supra, at pp. 374–375:

"A sale at auction, like every other sale, must have the assent, express or implied, of both seller and buyer. An announcement of an auction or the act of putting property up for sale at auction does not constitute an offer to sell capable of acceptance by the making of a bid. An advertisement of an auction is not an offer to sell which becomes binding, even conditionally, on the owner when a bid is made. Rather, an announcement that a person will sell his property at public auction to the highest bidder is a mere declaration of intention to hold an auction at which bids will be received. It is a mere invitation to those attending the sale to make offers by bids. The contract becomes complete only when the bid is accepted, this being ordinarily denoted by the fall of the hammer." (Footnote references omitted.)

The aforesaid text goes on to say:

"These common-law principles are adopted by the Uniform Commercial Code." (Footnote references omitted.) [11]

■ Thus, it can be said that where the auction has not been announced to be *without reserve*, the sale contract is consummated by the *offer of the bidder* to buy and the *acceptance of the bid by the seller*.

Corbin on Contracts § 108, "Auction Sales—Offers to Sell and to Buy," pp. 481–483, puts it this way:

"When an auctioneer presents an article for sale at auction and asks for bids, he is ordinarily not making an operative offer and creates no power of acceptance

---

11. Even though § 34–21–245, W.S.1977, Wyoming's Uniform Commercial Code, is inapplicable to the sale of realty, its provisions with respect to auctions are useful:

"(a) In a sale by auction if goods are put up in lots each lot is the subject of a separate sale.

"(b) A sale by auction is complete when the auctioneer so announces by the fall of the hammer or in other customary manner. Where a bid is made while the hammer is falling in acceptance of a prior bid the auctioneer may in his discretion reopen the bidding or declare the goods sold under the bid on which the hammer was falling.

"(c) Such a sale is with reserve unless the goods are in explicit terms put up without reserve. In an auction with reserve the auctioneer may withdraw the goods at any time until he announces completion of the sale. *In an auction without reserve, after the auctioneer calls for bids on an article or lot, that article or lot cannot be withdrawn unless no bid is made within a reasonable time.* In either case, a bidder may retract his bid until the auctioneer's announcement of completion of the sale, but a bidder's retraction does not revive any previous bid.

"(d) If the auctioneer knowingly receives a bid on the seller's behalf or the seller makes or procures such a bid, and notice has not been given that liberty for such bidding is reserved, the buyer may at his option avoid the sale or take the goods at the price of the last good faith bid prior to the completion of the sale. This subsection shall not apply to any bid at a forced sale." (Emphasis supplied.)

Instead, he is asking for offers to be made to him; and the bids made in response thereto are themselves offers that can be revoked by the bidders prior to an acceptance by the auctioneer. This is true even though the seller or his representative has issued advertisements or made other statements that the article will be sold to the highest bidder, or is offered for sale to the highest bidder. Such statements are merely preliminary negotiation, not intended and not reasonably understood to be intended to affect legal relations. When such is the case, the seller or his representative is as free to reject the bids, highest to lowest, as are the bidders to withdraw them. The seller may at any time withdraw the article from sale, if he has not already accepted a bid. He need give no reasons; indeed, he rejects all bids by merely failing to accept them—by doing nothing at all. It is not necessary for him to say that 'the privilege is reserved to reject any and all bids.' Such a statement is merely evidence that the goods are not being offered 'without reserve.'" (Footnote references omitted.)

This court's holding in *State v. State Board of School Land Comm'rs*, 27 Wyo. 54, 61–62, 191 P. 1073, 1075 (1920), is consistent with the principles announced above when we said in a matter involving a with-reserves auction:

"... 'Acceptance of a bid is denoted by the fall of the hammer, or by any other audible or visible means signifying to the bidder that he is entitled to the property on paying the amount of his bid according to the terms of the sale. Once a bid has been accepted, the parties occupy the same relation toward each other as exists between promisor and promisee in an executory contract of sale conventionally made. Thereafter, as a rule, the seller has no right to accept a higher bid, nor may the buyer withdraw his bid.' 2 R.C.L. 1126; *Coker v. Dawkins*, 20 Fla. 141, 153; *State v. Hoboken Bank*, 84 Md. 325–331, 35 Atl. 889; *Sherwood v. Reade*, 7 Hill (N.Y.) 439."

In summary, then, the law seems to be settled that in an auction *with reserves* —which seems to include all auctions where the advertisements and preliminary information representations do not announce the sale to be *without reserves*—the contract is formulated by the *offer* of the bidder and the *acceptance* of the seller.

### Offer and Acceptance—No Reserves Auctions

A *"no reserves"* auction is significantly different than the auction *with reserves* above described. As has been noted, in auctions—*with reserves*—the *bidder* is deemed to be the party making the offer, while the auctioneer (as agent for the seller), is the offeree with authority to either accept the bid or reject it. The ramifications of this are that the latter need not sell if he or his principal chooses not to and may, at any time before the hammer falls, withdraw the property from the auction block. If the bidding is too low, the auctioneer need do nothing and there is no resulting contract between the seller and any bidder. *This is not the case with a no-reserves auction.*

In the *no reserves* type of sale, which is the kind of sale with which we are here concerned, the legal relationship as between the seller and bidder is reversed. In the *no-reserves* sale, the *seller* becomes the offeror and the *bidder* the offeree by reason of a collateral contract theory which will be discussed in detail, *infra*. This role-switching exercise results in a significant readjustment of rights and obligations between the parties. For example, in the *no-reserves* auction, the contract is consummated with each bid, subject only to a higher bid being received. This is so because the seller makes his offer to sell when he advertises the sale will be a no-reserves sale to the highest bidder. Once the first bid has been received, the only acceptance which forms a binding agreement is the one offered by the highest bidder. In this type of sale, the seller may not withdraw his property once any legitimate bid has been submitted, as he may do at any time before the hammer

falls in the with-reserves auction. In the no-reserves situation, the seller is absolutely committed to the sale once a bid has been entered, no matter what the level of bidding or the seller's notion of the property's true value. This is the catastrophic situation in which Housel found himself where $4,000,000.00 worth of his property was being bid at the $1,600,000.00 level. He could not extricate his property from the sale because he had committed it to sale to the highest bidder (no matter how low the bid) —but that was his only commitment—that he would sell to the *highest bidder. He was not committed to selling to the next highest bidder.*

Lastly, all parties who have been notified of the fact that the sale is a no-reserves auction are bound by the consequences which flow from the law applicable thereto.

The propositions aforesaid are supported by the following discussion of authorities:

### *Authority Relative to No-Reserves Auctions*

It is said in 7 Am.Jur.2d, § 17, Auctions and Auctioneers, "Withdrawal of property; sales without reserve," p. 376:

"  .  .  .  The words 'without reserve' as used in auctions are words of art, as showing prospective bidders *that the property will actually go to the bidder offering the highest price*, and the seller may not nullify this purpose by bidding himself or through an agent, or by withdrawing the property from sale if he is not pleased with the bids." (Footnote reference omitted and emphasis supplied.)

At 7A C.J.S. Auctions and Auctioneers § 11, entitled, "Right to Withdraw Property; Sales without Reserve," pp. 868–869, it is said:

"Until the hammer falls and a bid is accepted, a locus penitentiae remains, and the seller may withdraw his property from sale; and he may withdraw it before any bidding, even where the sale is without reserve. The owner is under no legal duty to hold an advertised auction sale and may call it off without incurring liability to the buyers.

"However, when the auction is 'without reserve,' the owner of the property may not withdraw it from sale after bidding has commenced, and the owner may be held liable for withdrawal of the property from the sale after a bid. *The words 'without reserve' are words of art and mean that in making such an announcement the owner enters into a collateral contract with all persons bidding at the auction that he will not withdraw the property from sale, regardless of how low the highest bid may be; and the highest bona fide bidder at an auction 'without reserve' may insist that the property be sold to him or that the owner answer to him in damages.* A statement that the sale would be made to the highest bidder, or that part or all of the property would be sold that day, is not the equivalent of an announcement that the auction will be 'without reserve.'" (Footnote references omitted, and emphasis supplied.)

Corbin on Contracts, supra, pp. 483–484, says:

"An auction sale is one in which the price is determined by the competition of bidders. Even at such a sale as this, it is possible for the seller to make an operative offer to sell and thus cause each bid to be an acceptance of the offer. All that is necessary is that the seller shall express such an intention clearly and bring it sufficiently to the attention of the bidders. One mode of expression has been in such common use as to have received judicial interpretation. *If the seller states in his advertising of the auction, or states openly at the place of auction, that the sale will be 'without reserve', the seller thereby promises to sell the goods to the bidder who makes the highest bid in the competition at that time and place.* Before any bid has been made in response to such an offer, the seller has the power to revoke and to withdraw the goods from sale; *but after one bid has been made the seller's offer is held to be irrevocable. He is under a legal duty to sell the goods to the bidder at the price bid, conditional only on the absence of any*

*higher bid at that time and place."* (Footnote references omitted and emphasis supplied.)

See, also, American Law Institute, Restatement of the Law of Contracts § 27, p. 34, where the black-letter law says:

"§ 27. AUCTIONS: SALES WITHOUT RESERVE.

"At an auction, the auctioneer merely invites offers from successive bidders which he may accept or reject unless, by announcing that the sale is without reserve or by other means, he indicates that he is making an offer to sell at any price bid by the highest bidder. In that case after a bid has been made the auctioneer cannot withdraw. Even though the sale is announced to be without reserve any bidder may withdraw his bid until the auctioneer by fall of hammer, or in other customary manner, announces that the sale is complete."

In Vol. 15, Minnesota Law Review, 1931, in an article entitled "Bids as Acceptance in Auctions 'Without Reserve,'" at page 389, Professor Harvey Hoshour makes reference to the American Law Institute's "Official Draft" of the above-quoted § 27 and quotes the following from the "explanatory note appended to section 27":

" 'It must be possible . . . for an auctioneer, if he uses appropriate language, to become the offeror. An announcement that goods will be sold to the highest bidder has this effect. Fairly interpreted the language means that the auctioneer promises that whoever makes the highest bid shall become owner of the subject matter of the sale.' "

These propositions are expressed by the author in Williston on Contracts, Third Edition § 29, pp. 76–77, entitled, "Formation of Contract at Auction," when he says:

". . . But the law has adopted the doctrine that putting up goods for sale is merely an invitation to those present to make offers which they do by making bids, one of which is ultimately accepted by the fall of the hammer. By the weight of authority, the auctioneer may be said to invite offers. Since the bar-gain is incomplete until the hammer falls, a bidder may retract his bid until that time.

"The same point is involved in decisions turning on the right of the auctioneer to withdraw an article offered for sale; and for the same reason, until the hammer falls, the auctioneer may withdraw, *unless it has been advertised or announced that the sale shall be without reserve.* If such an advertisement or announcement has been made, the property may not be withdrawn after it has been put up and a bid made.

"Apart from statute, *it would seem that it is a strong inference of fact that the auctioneer merely invites offers, and that he might make himself the offeror by using language appropriate to the purpose, that is, by using language which, fairly interpreted, amounts to a promise on his part to sell to any person who shall make the highest bid. The announcement that he will sell without reserve, made in any form of words, would justify this interpretation. With reference to the sale of goods, it has been enacted that such an announcement binds the auctioneer, though the bidder may withdraw his offer at any time prior to the fall of the hammer."* (Emphasis supplied.)

In the Minnesota Law Review article, supra, at page 377, the author expresses the concept in the following way:

". . . It is the very fact that the sale is announced to be without reserve by the person who is responsible therefor that justifies the bidders, acting reasonably, in understanding that the property involved will be sold to the highest bidder, and that in such case a sale will be completed by each bid, subject only to the condition that no higher bid be received. It is conceivable that bidders would understand without such statement or its equivalent that even the putting up of goods does not constitute an offer, but where the sale has been announced to be without reserve the proposition is so unequivocal that a reasonable bidder could, it is submitted, understand it as meaning only one thing. . . ."

The doctrine was earliest analyzed in the holding in the English case of Warlow v. Harrison (1859) 1 E. & E. 309, where the court used the following language in a suit by the highest bidder against the auctioneer where the principal was undisclosed:

" 'The name of the auctioneers, of whom the defendant was one, alone was published; and the sale was announced by them to be without reserve. This, according to all the cases both at law and equity, means that neither the vendor nor any person in his behalf shall bid at the auction, and that the property shall be sold to the highest bidder, whether the sum bid be equivalent to the real value or not; *Thornett v. Haines*, 15 M. & W. 367. We cannot distinguish the case of an auctioneer putting up property for sale upon such a condition from the case of the loser of property offering a reward, or that of a railway company publishing a time table stating the times when, and the places to which, the trains run. It has been decided that the person giving the information advertised for, or a passenger taking a ticket, may sue upon a contract with him; *Denton v. Great Northern Railway Company*, 5 E. & B. 860. Upon the same principle, it seems to us that the highest bona fide bidder at an auction may sue the auctioneer as upon a contract that the sale shall be without reserve. We think the auctioneer who puts up for sale upon such a condition pledges himself that the sale shall be without reserve; or, in other words, contracts that it shall be so; and that this contract is made with the highest bona fide bidder; and, in case of a breach of it, that he has a right of action against the auctioneer. . . .' " Vol. 15, Minn. L.R., supra, at 379.

Modern American cases have followed and are following this doctrine.

In *Zuhak v. Rose*, 264 Wis. 286, 58 N.W.2d 693 (1953), where the owner in a *no-reserves* auction withdrew the property because the bids were not high enough, the court, construing the Uniform Sales Act, held that the seller could not withdraw and he was bound to sell to the highest bidder.[12] The court said:

"The words 'without reserve' as used in auctions are words of art, assuring prospective bidders that the property will actually go to the bidder offering the highest price. The seller may not nullify this purpose by bidding himself or through an agent, nor by withdrawing the property from sale if he is not pleased with the bids. *Thus, the seller may not refuse to accept a bid where the auction is without reserve; the bid itself establishes a right in the bidder to have the property unless someone else by raising his bid succeeds to his right.*" 58 N.W.2d at 696.

The court then went on to say:

" ' * * * *[W]here a sale is advertised or stated to be without reserve, there is an implied guaranty that the property is to be sold to the highest bidder*, and each bidder has the right to assume that all previous bids are genuine, and the seller in substance so assures him; * * *.' 7 C.J.S. Auctions and Auctioneers § 7, page 1257." (58 N.W.2d at 696),

and concluded with the thought

". . . that *when the real estate in question was put up for sale and the first bid made on it, defendant could no longer withdraw it but was bound to accept the highest bid unless other bids for different combinations of parcels or bids for the farm as a whole produced more money, as specified in the advertisement. Defendant cannot defeat the right which plain-*

---

**12.** It is said in states where the Uniform Commercial Code has been adopted that the law is the same. See 7 Am.Jur.2d, Auctions and Auctioneers § 17, p. 377, where it is said:

"Under the provisions of the Uniform Commercial Code an auction sale is with reserve unless the goods are in explicit terms put up without reserve. In an auction with reserve, the auctioneer may withdraw the goods at any time until he announces completion of the sale; in an auction without reserve, after the auctioneer calls for bids on an article or lot, that article or lot cannot be withdrawn unless no bid is made within a reasonable time. Similar provisions exist under the Uniform Land Transactions Act."

*tiff had acquired as highest bidder either by withdrawing the specific land from sale or by failing to fulfill the promise of the advertisement. . . ."* 58 N.W.2d at 697. (Emphasis supplied.)

In *Drew v. John Deere Company of Syracuse, Inc.*, 19 A.D.2d 234, 241 N.Y.S.2d 267, 269–270 (1963), the court said:

"The plaintiff's whole case rests upon the theory that the auction was one 'without reserve'. At such an auction, the owner of the property has no right to withdraw the property after bidding has commenced. It is also necessarily implicit in an auction 'without reserve', that the owner of the property may not himself bid in the property, as this would be equivalent to withdrawing it from sale (Restatement, Contract, § 27). *Various legal theories have been advanced for the holding that the announcement that the auction would be 'without reserve' imposes a binding legal obligation upon the owner, but the best view seems to be that the owner, by making such an announcement, enters into a collateral contract with all persons bidding at the auction that he will not withdraw the property from sale, regardless of how low the highest bid might be* (Gower, 'Auction Sales of Goods Without Reserve,' 68 Law Quarterly Review 457; Warlow v. Harrison (1859) 1 E. and E. 295, 309). *Therefore, the highest bona fide bidder at an auction 'without reserve' may insist that the property be sold to him or that the owner answer to him in damages* (Zuhak v. Rose, 264 Wis. 286, 58 N.W.2d 693; Forbes v. Hunter, 223 Ill.App. 400; Jones v. Hackensack Auto Wreckers, 124 N.J.L. 289, 11 A.2d 595; 7 Am.Jur.2d Auctions, § 21, p. 240; Annot., 37 A.L.R.2d 1049, 1056; 1 Corbin on Contracts, § 108, p. 341; 2 Williston on Sales, § 297, p. 205).

"On the other hand, in an auction not expressly announced to be 'without reserve', the owner may withdraw the property at any time before it is actually 'knocked down' to a bidder by the auctioneer. There is no contract until the offer made by the bidder is accepted by the auctioneer's 'knocking down' the

property to him (Personal Property Law, § 102, subd. 2). 'An action "with reserve" is the normal procedure' (Comment 2 to section 2–328, Uniform Commercial Code)." (Emphasis supplied.)

In *Wilcher v. McGuire*, Mo.App., 537 S.W.2d 844 (1976), the owner refused to sign the contract of sale to the highest bidder and the argument centered around the question of whether the pronouncements made by the auctioneer preceding the bidding rendered the sale one with or without reserve. Defendant-seller contended that the sale was "with reserve" and she could, therefore, withdraw the land—the high bidder contending the sale was "without reserve," which, when the high bid was made, rendered the collateral contract consummated. The court said:

". . . The words 'without reserve' are words of art and mean that in making such an announcement the owner 'enters into a collateral contract with all persons bidding at the auction that he will not withdraw the property from sale, regardless of how low the highest bid might be (citations omitted). *Therefore, the highest bona fide bidder at an auction "without reserve" may insist that the property be sold to him or that the owner answer to him in damages* (citations omitted).' *Drew v. John Deere Company of Syracuse, Inc.*, 19 A.D.2d 308, 241 N.Y.S.2d 267, 269[1, 2] (1963).

"Thus, in this case the plaintiffs argue that by stating all or part of the property would be sold on that day, the auctioneer was stating the sale was to be 'without reserve'." 537 S.W.2d at 846. (Emphasis supplied.)

The United States Court of Appeals, Tenth Circuit, adopts the collateral-contract no-reserves doctrine set out herein where, in *United States v. Blair*, 10 Cir., 193 F.2d 557 (1952), the United States brought action against one Blair to recover the difference between a bid of $100.50 and a bid of $1,542.00 by a third party whose bid was overlooked. The advertised condition of the sale was:

". . . 'In all cases the property will be awarded to the bidders submitting the highest bid. If through error we should make an award to someone other than the high bidder, the erroneous award will be revoked and the proper award will be made.'" 193 F.2d at 559. The court found the above-quoted condition controlled when it said:

"Generally, a sale by auction is complete when the auctioneer announces its completion. ·7 C.J.S., Auctions and Auctioneers § 7, page 1250. And, title passes to the successful bidder at that time, unless the parties intend to the contrary. *Harris v. Merlino*, 137 N.J.L. 717, 61 A.2d 276; *Lott v. Delmar*, 2 N.J. 229, 66 A.2d 25; 7 C.J.S. Auctions and Auctioneers § 8, page 1260. The owner of the property offered for sale at the auction has the right to prescribe the manner, conditions and terms of the sale. 7 C.J.S., Auctions and Auctioneers, § 7, page 1251. *The buyer may rely upon such announced terms and conditions of the sale, and he is likewise bound thereby*, whether present at the time of the announcement or has knowledge thereof. 5 Amer.Juris. Auctions, Sec. 15, p. 454; *Kivett v. Owyhee County*, 58 Idaho 372, 74 P.2d 87; *Erie Coal & Coke Corp. v. United States*, 266 U.S. 518, 45 S.Ct. 181, 69 L.Ed. 417; See Annot. 28 A.L.R. 991.

"It follows that the award to Blair and the issuance of the title documents were subject to the announced condition that if his bid was not the highest one, the award would be 'revoked and the proper award will be made', . . .

\*    \*    \*    \*    \*    \*

". . . Here, the highest bid was an *unalterable condition of the sale, and title did not unconditionally pass to any other bidder.*" 193 F.2d at 560. (Emphasis supplied.)

### The Auctioneer's Discretion in a No-Reserves Auction

■ In light of the above, we place little store in the appellant's argument that the auctioneer, through his right to establish bidding increments, has the power to defeat the seller's contract with the highest bidder in a no-reserves auction.

■ Succinctly stated: The auctioneer's authority must and is determined by his contract. It is said in 7A C.J.S. Auctions and Auctioneers § 5, supra, p. 861:

"Auctioneer's authority, when based upon the express contract or instrument, is governed by its terms. . . ."

Here the auctioneer was bound by contract to

"use their [his] best efforts to obtain buyers who will pay the highest prices obtainable at the public auction."

In pursuit of this purpose, the auctioneer agreed to conduct—in fact insisted upon conducting—a no-reserves auction. As we have seen, in a no-reserves auction there can be no contract except with the highest bidder. This means that once the policy decision is made that the auction will be a no-reserve sale, and bidding has commenced, the auctioneer has no more discretion with respect to whether he will or will not sell to a bidder other than he who makes the highest bid than does the owner—which is none at all. The owner can't withdraw his property once bidding has commenced and title to his property must and does pass to the highest bidder. For all the same reasons, the auctioneer cannot consummate a sale in the owner's behalf with anyone except the highest bidder. It follows that a no-reserves auction cannot be conducted, as it was in this case, with an increment policy which has as its effect the rejection of the highest bid, for the reason that the owner, when he advertises the no-reserves auction, makes an unconditional offer to sell only to the highest bidder.

Pitchfork, informed of the highest-bidder concept in the no-reserve rule (see fn. 6, supra), cannot here be heard to assert and rely upon the auctioneer's erroneous understanding of the law and the auctioneering business in order to defeat the law of no-reserves auctions. Pitchfork came to the sale relying upon the highest-bidder requirement of the no-reserve rule and is bound by

the rule, as is everyone connected with the sale.

The cold, hard fact of the matter is that there was no contract entered into with Pitchfork because it did not submit the highest bid in a no-reserve auction, where only the highest bidder is qualified to contract with the seller for purposes of acquiring title to the property.

## CONCLUSION

Under the above authorities and for the reasons set out herein, a no-reserves sale contemplates that the offer to sell to the highest bidder is made by the seller when he advertises the property for sale at auction and undertakes to conduct the auction without reserve. All bidders at such sale are bound to the no-reserves condition of the sale. There is no contract of sale until the highest bid is made. The seller's contract is with the highest bidder. The highest bidder can enforce his rights in damages. Other bidders have no claim for transfer of title against the seller because they have no contract upon which to base a right of action. Since there is no contract possible except that which exists between the highest bidder and the seller, the appellant's argument to the effect that the sale was consummated between the seller and Pitchfork because of the auctioneer's minimum-increment policy is without validity. The auctioneer agreed to a no-reserves sale and he is bound by it, as is Bar TL, Pitchfork and all other bidders.

The trial court was correct in its conclusion. Pitchfork's was not the highest bid in a no-reserves sale where contract with the highest bidder is requisite to the passage of title. Since a contract of sale was not consummated between Bar TL and Pitchfork, Bar TL is under no obligation to deliver title to the subject ranch properties to Pitchfork.

Affirmed.