DRY CREEK CATTLE COMPANY,
a Wyoming general partnership,
Appellant (Plaintiff),

v.

HARRIET BROS. LIMITED PARTNER-
SHIP, a Wyoming limited partnership,
and Garry Davis, Appellees (Defen-
dants).

No. 95–3.

Supreme Court of Wyoming.

Dec. 7, 1995.

Rehearing Denied Jan. 9, 1996.

John W. Davis of Davis, Donnell, Worrall & Bancroft, P.C., Worland, for Appellant.

Timothy J. Kirven of Kirven & Kirven, P.C., Buffalo, for Appellee Harriet Bros.

Philip A. Nicholas and Jeff Anthony of Nicholas Law Offices, Laramie, for Appellee Davis.

Before GOLDEN, C.J., and THOMAS, MACY, TAYLOR and LEHMAN, JJ.

THOMAS, Justice.

The critical issue in this case is whether Harriet Bros. Limited Partnership (Harriet Bros.), the seller of ranch properties at auction, advertised and conducted an auction with reserves or without reserves. The published auction rules stated that, in first considering bids upon eleven parcels, a minimum bid was required as to each parcel of land. If the minimum bid were received on each parcel, then those parcels would be considered sold to the highest respective bidders, subject to offering the entire ranch property as a unit. The seller then would accept the highest sale price, either the aggregate of the bids on the eleven parcels or the bid for the ranch property as a whole. Collateral issues are raised with respect to the propriety of the district court's summary judgment in light of a claimed ambiguity in the auction rules; error in the court's refusal to rule that the aggregate of the parcel bids should have

been accepted; and the court's denial of additional discovery before its ruling on the summary judgment. We hold the district court properly concluded there was no ambiguity in the auction rules; the offering of the eleven parcels was conducted as an auction with reserves; and there was no necessity for additional discovery. The Order Granting Summary Judgment for Defendants is affirmed.

Dry Creek Cattle Company (Dry Creek) states these issues in its Appellant's Opening Brief:

A. Whether the trial court erred in refusing to declare a combination of auction bids totaling $4,045,000 the winner over an auction bid of $3,960,000.

B. Whether the trial court erred when it granted summary judgment despite factual conflicts regarding the intention of the parties with respect to ambiguous contractual provisions.

C. Whether the trial court should have permitted additional discovery to be completed before ruling on summary judgment.

In the Brief of Appellee Harriet Bros. Limited Partnership, the issues are stated to be:

I. Did the trial court properly determine that the public auction conducted by appellee Harriet Bros. Limited Partnership was a reserve auction?

II. Did the trial court properly determine that no contract existed between Appellant and Appellee Harriet Bros. Limited Partnership for real property sold at auction?

III. Whether the district court abused its discretion in proceeding with a summary judgment hearing where Appellant had conducted extensive discovery and had filed its own motion for judgment on the pleadings?

In the Brief of Appellee Garry Davis (Davis), this statement of the issues appears:

A. Did the trial court properly determine that as a result of the auction no contract arose for Harriet Bros. Limited Partnership to sell parcel five to appellants?

B. Did the trial court abuse its discretion by proceeding with a summary judgment hearing after Appellant had conducted discovery and had filed its own motion for judgment on the pleadings?

The ranch that was owned by Harriet Bros. is located in Campbell, Johnson, and Washakie Counties. It consists of approximately 93,194 acres of deeded and leased land. Harriet Bros. decided to dispose of the ranch and entered into a listing contract with Lowham Associates (Lowham) to sell the ranch at public auction. It was contemplated the auction would be conducted by an auctioneer retained by Lowham. The auction was conducted on December 10, 1993 in Buffalo, and the conditions of sale and the descriptions of the property were included in an advertising brochure. The same brochures were distributed to all bidders who registered before the auction commenced. The critical paragraph appearing in that advertising brochure reads:

> **Minimum Bid—Absolute Auction: On receiving the announced minimum bid for each offered ranch property,** the auction will then move to an absolute sale with the parcels selling to the highest bidders as acknowledged by the auctioneer. The ranch will be offered in 11 separate ranch units as hereafter outlined and also in its entirety. Sellers will accept that bid or combination of bids that make up the highest sales price for the total offering. (Emphasis added.)

The brochure then listed the minimum bid Harriet Bros. would accept for each of eleven parcels, as well as a minimum bid for the entire ranch.[1]

At the commencement of the auction, the auctioneer told the bidders he would seek to obtain the minimum bid for each of the elev-

---

1. On page twelve of the sales brochure, each of the eleven ranch parcels were listed with a corresponding minimum bid price. These were designated as: Parcel 1, $300,000; Parcel 2, $375,000; Parcel 3, $375,000; Parcel 4, $255,000; Parcel 5, $199,000; Parcel 6, $75,000; Parcel 7, $258,000; Parcel 8, $400,000; Parcel 9, $272,000; Parcel 10, $845,000; and Parcel 11, $635,000. The minimum bid for the entire ranch was established at $3,870,000.

en parcels in the first round of bidding. He told the bidders they would have the opportunity to put together combination bids on various parcels in the second round of bidding, and that bidders also were free to increase their bids on the individual parcels during the succeeding rounds of bidding. The auctioneer announced finally that bids would be taken on the entire Harriet ranch as provided in the brochure, with bidding competition in rounds three and four.

As the auction proceeded and bids were received in each round, they were posted on blackboards in the front of the room. After the first round of bidding, five of the eleven parcels had not received the advertised minimum bid. In the second round, bids were received on combinations of parcels and, in the third round, the auctioneer requested bids on the entire ranch property, that is, for all eleven parcels as a unit. After the third round of bidding, Dry Creek had submitted a bid of $270,000 for Parcel 5, which was $71,000 above the minimum listed in the sales brochure. Minimum bids for Parcels 3 and 11 had not been received. At this time, a bid was received for the entire ranch property in the amount of $3,960,000.

During the fourth and final round of bidding, the auctioneer again tried to obtain minimum bids for Parcels 3 and 11, or a combination of bids that would result in minimum bids for these two parcels, but this effort was unsuccessful. In effect, the auctioneer stated he needed all the minimums reached, and the aggregate of the bids on the parcels would have to be more than the current bid on the entire ranch if the individual bidders were to succeed in buying the ranch.[2] The requested minimum bids for all eleven parcels did not materialize, and the auctioneer, by the fall of the hammer, awarded the ranch to the high bidder on the entire ranch at a price of $3,960,000.

In his effort to discharge the debt of $3,960,000 to Harriet Bros., the purchaser made assignments of specific parcels to others in return for their payment of a portion of the total purchase price. He assigned to Davis the title to Parcel 5, which is the parcel that Dry Creek claims to own by virtue of its bid of $270,000 at the auction. Because the entire ranch was sold, instead of the several parcels, Dry Creek filed this action in the district court of Johnson County, seeking to establish a contract to purchase Parcel 5 for the amount Dry Creek bid at the auction. Dry Creek further alleged a breach of contract with resulting damages. Harriet Bros.' stance was that there could be neither breach nor damage because there was no contract formed with Dry Creek.

About three weeks after initiating the action, Dry Creek filed a motion for judgment on the pleadings and, the next day, it requested a hearing be set. The trial court set the hearing for approximately six weeks later, but it continued and rescheduled that hearing when Dry Creek sought a continuance and requested additional time for discovery. Subsequently, Harriet Bros. filed its Amended Motion for Summary Judgment, and the hearing then was set for the end of May. Dry Creek filed a cross-motion for partial summary judgment based on its claim that the only party Harriet Bros. could contract with to sell Parcel 5 was Dry Creek. In addition, Dry Creek's cross-motion sought an extension of time to complete discovery and leave to amend.

After hearing all pending motions, the district court entered its Order Granting Summary Judgment for Defendants. That order disposed of all Dry Creek's claims, leaving intact certain counterclaims by Harriet Bros. Later in the fall, the district court entered its Order for Final Judgment Under W.R.C.P. 54(b), and Dry Creek perfected this appeal.

This court previously has considered an auction sale of a ranch. *Pitchfork Ranch Co. v. Bar TL,* 615 P.2d 541 (Wyo.1980). After quoting extensively from encyclopedias and treatises addressing the subject of auctions, we spoke to the concept of an auction with reserves as compared to one without reserves:

---

2. The auctioneer's exact words were: "[I]f we do not have an increase on the entirety or if we do not have the minimum bids exceeding that **by reaching all the minimums,** we're going to sell the property. The way it stands right now, it will be accepted as 3.9 on the total ranch." (Emphasis added.)

"In summary, then, the law seems to be settled that in **an auction *with reserves*— which seems to include all auctions where the advertisements and preliminary information representations do not announce the sale to be *without reserves***—the contract is formulated by the *offer* of the bidder and the *acceptance* of the seller.

\*　　\*　　\*　　\*　　\*　　\*

A *"no reserves"* auction is significantly different than the auction *with reserves* above described. As has been noted, in auctions—*with reserves*—the *bidder* is deemed to be the party making the offer, while the auctioneer (as agent for the seller), is the offeree with authority to either accept the bid or reject it. The ramifications of this are that the latter need not sell if he or his principal chooses not to and may, at any time before the hammer falls, withdraw the property from the auction block. If the bidding is too low, the auctioneer need do nothing and there is no resulting contract between the seller and any bidder. *This is not the case with a no-reserves auction.*

In the *no reserves* type of sale, which is the kind of sale with which we are here concerned, the legal relationship as between the seller and bidder is reversed. In the *no-reserves* sale, the *seller* becomes the offeror and the *bidder* the offeree by reason of a collateral contract theory which will be discussed in detail, *infra*. This role-switching exercise results in a significant readjustment of rights and obligations between the parties. For example, in the *no-reserves* auction, the contract is consummated with each bid, subject only to a higher bid being received. This is so because the seller makes his offer to sell when he advertises the sale will be a no-reserves sale to the highest bidder. Once the first bid has been received, the only acceptance which forms a binding agreement is the one offered by the highest bidder. In this type of sale, the seller may not withdraw his property once any legitimate bid has been submitted, as he may do at any time before the hammer falls in the with-reserves auction. In the no-reserves

situation, the seller is absolutely committed to the sale once a bid has been entered \* \* \*."

*Pitchfork*, 615 P.2d at 548–49 (emphasis added, italics in original).

■ In this instance, Dry Creek relies upon the advertisement announcing an "absolute auction." That phrase cannot be taken out of the context of the paragraph quoted above, which announces an auction without reserve only after the condition precedent has been satisfied. That condition precedent was the receipt of the announced minimum bid for each offered parcel of the ranch. The advertisement went on to announce, however, that the ranch also would be offered in its entirety, and the sellers would accept the bid for the ranch in its entirety or the combination of bids for the several parcels, whichever constituted the highest sales price for the total offering.

Dry Creek contends the word "each" in the paragraph on which it relies simply meant that as each individual parcel received a minimum bid, the parcel moved into an absolute sale position, that is, the auction of the parcel became one without reserves. Since Dry Creek submitted the highest bid over the minimum on Parcel 5 prior to the time the auctioneer's hammer fell, Dry Creek insists Harriet Bros. was contractually obligated to sell Parcel 5 to Dry Creek. Harriet Bros.' interpretation of the word "each" in the context of the above paragraph is that it means "all eleven parcels must receive their minimum bids before there can be an absolute sale of the ranch." We turn to the work of lexicographers to resolve this debate. In BLACK'S LAW DICTIONARY 507 (6th ed. 1990), we find this definition:

**Each.** A distributive adjective pronoun, which denotes or refers to **every** one of the persons or things mentioned; **every** one of two or more persons or things, **composing the whole,** separately considered. The effect of this word, used in the covenants of a bond, is to create a several obligation. The word "any" is equivalent to "each." *Conerty v. Richtsteig*, 308 Ill.App. 321, 31 N.E.2d 351. [ (1941) ]. "Each" is synonymous with "all" and agrees in inclusiveness but differs in stress; "all" collects and

"each" distributes. *Knox Jewelry Co., Inc. v. Cincinnati Ins. Co.*, 130 Ga.App. 519, 203 S.E.2d 739, 740 [ (1974) ]. (Emphasis added.) [3]

In the same work, we find this definition:

**Every.** Each one of all; all the separate individuals who constitute the whole, regarded one by one. The term is sometimes equivalent to "all"; and sometimes to "each".

BLACK'S LAW DICTIONARY 555.

We conclude the language in the advertisement which reads, "[o]n receiving the announced minimum bid for each offered ranch property, the auction will then move to an absolute sale with the parcels selling to the highest bidders as acknowledged by the auctioneer," is grammatically apt to convey the proposition that a minimum bid must be received for all of the parcels before the auction would move to an absolute sale. The legal effect is that this auction was one with reserves until that condition was satisfied as to every one of the several parcels.

The general definitions of these words are parallel. In WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 713 (1993), the word "each" used as an adjective connotes "being one of two or more distinct individuals having a similar relation and often constituting an aggregate." In that dictionary, at 788, "every" is defined as:

**every/ * * * 1 a:** being each individual or part of a class or group whether definite or indefinite in number without exception * * *.

In *Pitchfork,* we ruled an auction is "with reserves" in all circumstances where it is not announced, advertised, or represented to be an auction "without reserves." There is nothing in the brochure for the sale of the Harriet ranch to the effect that it was to be an auction "without reserves." The brochure advertised a "minimum bid—absolute auction," but the balance of the language of the paragraph manifests an entirely different concept from an auction without reserves.

The condition precedent is clearly presented. Furthermore, the four-tier bidding process was outlined in a memorandum furnished at the sale and, after the first three rounds of bidding and a recess, the final round of bidding was described as:

*FINAL ROUND OF BIDDING:* **The auction will be held open and additional bids received on all individual units, combinations and/or the entirety** (beginning at the pre-recess bids level) until the auctioneer gives notice of closing the bidding process and sellers [sic] acceptance of the bids or combination of bids that result in the highest sale price for the Harriet Ranches. (Emphasis added.)

It is clear from this language that Harriet Bros. was receiving offers up to this final round of bidding. The auctioneer never let the auction hammer fall, nor did he announce a sale prior to that last round of bidding. The sale was an auction with reserves, at least until the final round was reached, and the quoted language still alludes to the acceptance by the sellers of the bids or combination of bids resulting in the highest sale price.

The accepted bid was $3,960,000 for the entire ranch property. As we stated in *Pitchfork,* 615 P.2d at 547 (emphasis added):

An advertisement of an auction is not an offer to sell which becomes binding, even conditionally, on the owner when a bid is made. Rather, an announcement that a person will sell his property at public auction to the highest bidder is a mere declaration of intention to hold an auction at which bids will be received. It is a mere invitation to those attending the sale to make offers by bids. **The contract becomes complete only when the bid is accepted,** this being ordinarily denoted by the fall of the hammer.

What occurred at the sale is entirely consistent with our interpretation of the pertinent language of the advertisement. In the

**3.** We considered the meaning of the word "any" in *McKay v. Equitable Life Assurance Soc'y of the United States,* 421 P.2d 166, 169 (Wyo.1966), where we held that "[t]he common and ordinary understanding of the word is that it means all or every." Our definition of the word "any," described by BLACK'S LAW DICTIONARY 507 (6th ed. 1990) as equivalent to the word "each," manifests our prior accord with BLACK'S definitional approach.

final round, the auctioneer made it clear the seller would accept the aggregate of the bids on the parcels or the bid on the entire ranch, whichever was higher, with the caveat that the aggregate of the bids must include at least the minimum bid on each parcel. He summed it up in this way:

> If you add up the total of what has been bid on the individual units, they, in effect, might slightly exceed [the bid on the entire ranch]. The problem with it is the Harriet Family has set minimum bids on the individual tracts. * * * They set the minimums and they're not willing to set—sell below the minimums.

Before starting the bidding on the final round, the auctioneer stated:

> And start the entirety at 3.96 [$3,960,-000]. The total ranch. I'm going to put the clock on it. **And in five minutes, if we do not have an increase on the entirety or if we do not have the minimum bids exceeding that by reaching all the minimums,** we're going to sell the property.
>
> The way it stands right now, it will be accepted as 3.96 on the total ranch.

Since there was no increase in the bidding to reach the minimums established for Parcels 3 and 11, Harriet Bros. accepted the high bid for the entire ranch. At that point, a contract was formed between Harriet Bros. and the purchaser of the entire ranch. There is nothing in this record to demonstrate any contract between Dry Creek and Harriet Bros.

■ There was no error on the part of the trial court in refusing to hold that the combination of the parcel bids became the winner over the bid for the entire ranch. No contract was formed between Harriet Bros. and any of the bidders who bid only on the parcels. With respect to the contention that there is a genuine issue of material fact with respect to the claimed ambiguity of the contractual provisions, there is no meeting of the minds in an auction sale until the offer of the bidder is accepted in an auction with reserves or until the high bid is made in an auction without reserves. It follows that any difference between the parties' interpretation of the language in the advertisement does not constitute a material fact. The only significance of the advertising brochure language is the effect it has in structuring an auction as one "with reserves" or "without reserves."

■ Turning to the final contention of Dry Creek that it should have been permitted additional discovery before the court ruled on the summary judgment, denying additional time for discovery is a matter within the discretion of the trial court. *Kimbley v. City of Green River*, 642 P.2d 443, 444 n. 2 (Wyo. 1982). In light of our resolution of this case, we are not persuaded that any additional discovery would have been in any way fruitful. We have not been shown any abuse of discretion on the part of the trial court.

We hold that, with respect to the sale of the Harriet lands by parcels, the auction was one "with reserves," and no contract was ever formed for the sale of Parcel 5 between Harriet Bros. and Dry Creek. The Order Granting Summary Judgment for Defendants is affirmed.