## Richmond

### JOSEPH K. HOLSTON, ET AL.

### V.

### GEORGE W. PENNINGTON, ET AL.

June 17, 1983.

Record No. 801160.

Present: All the Justices.

552

*G. C. Jennings* for appellants.
*Donald G. Hammer (John Roger Thompson; Burke, Graybeal and Hammer*, on brief), for appellees.

RUSSELL, J., delivered the opinion of the Court.

In this appeal from a decree of specific performance, we must consider whether the seller of land at an "absolute auction" may "block" various parcels together, whether a successful bid recorded by the auctioneer satisfies the statute of frauds, and whether the auctioneer may bid at the sale. We affirm the decree.

Joseph K. Holston and his wife were the owners of two tracts of land in Smyth County containing about eighty acres in the aggre-

gate. The tracts were not contiguous, but were close together. The owners divided the first tract into four lots, each of which was traversed by a right-of-way, twenty feet wide, which constituted the sole access to the second tract, a forty-eight acre parcel of mountain land.

The owners engaged Robert Keyes and Fred A. Lindamood, auctioneers, trading as Rural Retreat Land Auction Co., and W. Watson Gollehon, trading as Gollehon Auction Co., to sell the property. The auctioneers advertised an "ABSOLUTE AUC-TION SALE" to be held on July 21, 1979, on the property. The advertisement stated: "This property is subdivided into tracts, making it ideal for the second home or hunting resort . . . . Terms — one third down, balance on delivery of deed." No other information was published as to the method of selling or condi-tions of sale.

At the sale, the following announcements were made: (1) the land would be sold to the highest bidder, (2) a one-third down payment would be required at the end of the sale, (3) the four smaller lots were subject to a twenty-foot right-of-way for the benefit of the forty-eight acre mountain tract, and (4) the owners reserved the right to "block" the parcels, *i.e.*, to offer them for sale together, as a whole.

Before bidding opened, the auctioneers distributed copies of a plat which showed only the four lots, traversed by the twenty-foot right-of-way. The lots were then offered one by one, and were knocked down to successful individual bidders. The auctioneer noted the names of the successful bidders and the amounts of their bids, but before closing the transactions, offered the four lots as a "block," seeking a higher price than the aggregate of the four individual bids.[1] No "block" bids were received. The auctioneer then prepared four memoranda on a printed form as follows:

---

[1] The purchasers testified that the auctioneer, in seeking bids for the four lots as a block, stated that this would be the last time the lots would be offered for sale. Gollehon testified that the statement was: " 'this will be possibly your last chance to buy this property,' " and "if they are not blocked together the sale stands as is." The purchasers further testified that upon failing to sell the lots as a block, the auctioneer turned to the owner and said, "Well, it's final then. The land is sold, isn't that correct, Mr. Holston," and that the owner replied, "it's sold."

## GOLLEHON AUCTION COMPANY

State of _____County of _____

This is to certify that I have this day purchased, at AUC-TION Sale from _____
Through GOLLEHON AUCTION COMPANY.
Tract or Lot No. _____as per map shown.
Purchase Price $_____PER BOUNDRY [sic] and I hereby bind myself to accept said property as per the terms, conditions, reservation, etc., as announced at said AUCTION SALE and pay for same accordingly, subject to seller's confirmation.

This the _____Day of_____, 19_____.
Witnesses:
_____ Name_____
_____ Address_____
Make deed to_____
Cash payment $_____; Balance in installments of
$_____.

The auctioneers filled in all the blanks, secured the signatures of the successful bidders, and signed the form as "witnesses." One bidder said that he had to go somewhere to get a check for his down payment and left the scene temporarily. The other successful bidders all gave checks to the auctioneer for the requisite down payments. The auctioneer told them that deeds would be available within approximately thirty days, at which time the balance of the purchase price would be required. Thinking the sale was ended as to the property in which they were interested, some of the purchasers left the scene and went to examine the lots they thought they had purchased. Others remained, but having no interest in the mountain tract, became involved in conversation and paid little attention to the proceedings.

The auctioneers then distributed a plat of the forty-eight acre mountain tract and took bids on it. They knocked it down to Harry Joe Yates, who signed a similar memorandum. The total of the five successful bids amounted to $18,435.00. One of the purchasers heard someone shout "[t]hrow it all together." The auctioneers then stated that all four lots would be "blocked" together with the forty-eight acre tract, and that bids would be received on all parcels as a whole. At this point, Robert N. Keyes, a principal

in Rural Retreat Land Company, one of the auctioneers, bid $20,000.00 for all five parcels. The parcels were knocked down to him because his bid exceeded the total of the five individual bids.[2]

Within the next few weeks, the auctioneers tendered a return of the deposit checks given by the individual bidders. The bidders refused the tender and brought suit for specific performance against the owners and auctioneers. After hearing the case upon depositions, the trial court, in a letter opinion, ruled in favor of the individual bidders and entered a decree of specific performance. The defendant owners and auctioneers were awarded an appeal.

It is generally held that an advertisement of a forthcoming auction obligates the owner to conduct a bona fide sale in accordance with the advertised terms, *Schwartz* v. *Capital Sav. & Loan Co.*, 56 Ohio App.2d 83, 381 N.E.2d 957 (1978). The auctioneer may, however, prior to opening the bidding, make oral modifications and additions to the advertised terms, which will be binding upon the bidders. *See Matter of Premier Container Corp.*, 95 Misc. 2d 859, 408 N.Y.S.2d 725 (1978); *Perry Trading Co.* v. *Tallahassee*, 128 Fla. 424, 174 So. 854 (1937).

The term "absolute auction" is equivalent to the term "auction without reserve," a well-recognized term of art in the law of sales. It means that the property will actually be sold to the highest bidder at that time and place, that no minimum price will limit the bids, that the owner may not withdraw the property from sale after the first bid has been received, that the owner may not reject any bid or all bids, and that the owner may not nullify the sale by bidding himself or through an agent. *Pitchfork Ranch Co.* v. *Bar TL*, 615 P.2d 541 (Wyo. 1980); *Zuhak* v. *Rose*, 264 Wis. 286, 58 N.W.2d 693 (1953).

Here, the first two conditions of sale announced by the auctioneer were in substantial conformity to the advertisement: the announcement that the land would be sold to the highest bidder was consistent with the advertisement of an "absolute auction;" the requirement of a one-third down payment also conformed to the notice. The other two announcements, reservation of a right-of-

---

[2] Keyes testified that he was reticent about submitting a bid openly, so he asked a bystander to do the bidding for him. At the end of the sale, however, Keyes signed the auctioneer's memorandum. Keyes also testified that his intention was to acquire the land for his brother-in-law, and that he was not acting for the owners, Mr. and Mrs. Holston, who were unaware of his bid. He said he simply thought the land was going "too cheap." For the reasons hereinafter stated, his motivation and purpose are immaterial.

way and reservation of the right to "block" parcels, were additional, but valid.

Unlike the situation which prevails in an ordinary auction, which is "with reserve" unless expressly made otherwise, in the case of an auction without reserve, the announced terms of sale constitute a continuing offer by the owner, subject to acceptance by the submission of a bid. Each bid is the consummation of a contract, subject only to the receipt of a higher bid. *Pitchfork*, 615 P.2d at 548. If the right to "block" parcels is reserved, the bidder's contract is further subject to the receipt of an upset bid by which the owner will receive a higher price for all parcels than the total of the individual bids in hand.[3] But the bidder's contract is final with the fall of the hammer, subject only to the receipt of such higher bids. If none are received, his contract dates from the time the hammer fell, following receipt of his bid.

The auctioneer's search for higher bids ends when he indicates by any means which would be evident to an attentive bidder, that the sale is over. He may not thereafter reopen the bidding. *See Zuhak*, 264 Wis. at 293, 58 N.W.2d at 697.

Applying these principles to the present case, it is clear that the purchasers of the four lots formed binding contracts of sale with the owners when the hammer fell as to their respective bids, subject only to the receipt of an overall upset bid when the lots were "blocked." When the "blocked" sale was cried, and no bids were received, these sales became final. The conduct of the auctioneer in writing out memoranda of sale and accepting deposit checks would be sufficient alone to evidence the end of the sale. The oral remarks of the auctioneer and the owner further confirmed the finality of these transactions. The words "subject to seller's confirmation" in the memorandum were employed too late to have any effect. These words would have negated an auction without reserve had they been uttered before the sale. But an "absolute auction" had been announced, conducted, and terminated before these words were communicated to the purchasers. By that time the sales were final.

Yates' purchase of the forty-eight acre tract also became final when the hammer fell on his, the highest and last bid. It could not be subject to an upset bid by reason of "blocking," be-

---

[3] It is immaterial whether parcels "blocked" are contiguous.

cause all other parcels exposed to sale had by then been finally sold. No parcels remained with which to "block" it.

 We turn to the effect of the statute of frauds upon the sales. The appellants point out that auction· sales of lands are within the statute, Code § 11-2(6), which requires a memorandum in writing, signed by the party to be charged, or his agent. The owners signed nothing in this case, and the signatures of the auctioneers to the memoranda purported only to witness the signatures of the purchasers. This question has been at rest in Virginia for nearly a century and a half.

In *Brent* v. *Green*, 33 Va. (6 Leigh) 16 (1835), after an extensive review of the English cases, the Court of Appeals held that for a brief time, from the fall of the hammer until the closing of the sale, an auctioneer is the agent both of the buyer and of the seller. If he makes any written notation of the buyer's name and the amount of his bid for the property sold during this time, it is a sufficient memorandum to take the case out of the statute of frauds. The following year, in *Smith* v. *Jones*, 34 Va. (7 Leigh) 165, 166 (1836), in response to a plea of the statute of frauds, the Court held sufficient a memorandum by the auctioneer's clerk in his account book, which set down opposite the listing of the land, merely: "$4 10 per acre, purchaser *W. Smith*." We hold the auctioneer's memoranda in this case to be sufficient to satisfy the statute of frauds. *See also Brown* v. *Butler*, 87 Va. 621, 13 S.E. 71 (1891).

 Moreover, the individual purchasers were the highest bidders because the auctioneer's bid was, as to them, void. As stated above, the auctioneer is the agent of the seller throughout the sale and, after the fall of the hammer, becomes the agent of the purchaser as well. He may not, without total infidelity to these duties, bid either for himself or for another, nor may he do so indirectly through an agent. *Brock* v. *Rice, et al.*, 68 Va. (27 Gratt.) 812 (1876). While such a bid may be generally voidable, rather than void, so as to be valid if ratified by the parties to the sale, and valid as to a stranger, there can be no question of its invalidity against the claim of either party to whom the auctioneer owed a duty.

For these reasons, the decree of the trial court will be

*Affirmed.*