KARL F. MARTEN AND ADAM J. MARTEN, APPELLEES, V. BARBARA A. STAAB AND JUDITH M. MARTEN, COPERSONAL REPRESENTATIVES OF THE ESTATES OF FRED J. MARTEN AND RUTHANNA MARTEN, DECEASED, APPELLANTS.

537 N.W.2d 518

Filed September 5, 1995.   No. A–94–621.

Claude E. Berreckman, of Berreckman & Berreckman, P.C., for appellants.

Robert E. Wheeler for appellees.

SIEVERS, Chief Judge, and IRWIN and MUES, Judges.

SIEVERS, Chief Judge.

We are called upon in this case to review the law of auctions. The dispute arises from an auction of a 2,840-acre ranch located in Thomas and Cherry Counties, Nebraska, which was owned by the decedents, Fred J. and Ruthanna Marten.

This action was brought in the district court for Thomas County by Karl F. Marten and Adam J. Marten, who contended they were the successful bidders for the Marten ranch at the auction. Karl and Adam contended that they were entitled to a decree of specific performance conveying the ranch to them.

## FACTUAL BACKGROUND

Fred J. and Ruthanna Marten ranched on land located in Thomas and Cherry Counties, Nebraska. They had two sons, Karl F. and Herman, and two daughters, Barbara A. Staab and Judith M. Marten. Adam J. Marten, Karl's son, is the grandson of Fred and Ruthanna.

Fred died in May 1985, Ruthanna died in January 1991, and neither had a last will and testament. Although Karl had leased the ranch in partnership with his brother, Herman, prior to 1983, in 1983 Karl became the sole lessee of the ranch. Upon his father's death, Karl and his mother were appointed copersonal representatives of Fred's estate, and upon his mother's death, Karl and his sister Judith were copersonal representatives of that estate. The actual management of the estates was left to Karl, but he failed to properly perform his duties, and he was removed as personal representative of both estates in March 1993. Karl's sisters, Judith and Barbara, were appointed copersonal representatives and they, through their attorney, Tedd Huston, conducted the auction at issue to sell the Marten ranch. Huston was also a licensed real estate broker.

On September 30, 1993, an auction for the Marten ranch was held at the Thomas County courthouse in Thedford, Nebraska. The sale was tape-recorded by counsel for Karl and Adam and transcriptions of the tape are in the record before us, as well as the actual tape.

Huston began by describing the land and setting forth the legal description and improvements. In his initial remarks about the property and the sale, Huston stated, "This will be an

auction with no protected bids, however, the sale is upon authority of the county court . . . ." Huston was asked before the bidding began if the tracts were going to be tied together, and the following exchange then occurred:

HUSTON: It's going to be sold only by the tracts and we're not going to have one overall bid for all.

ADAM MARTEN: Is this an absolute sale?

. . . HUSTON: This is a sale subject to confirmation by the court, as I just read. It will have to be approved by the county court.

The land was offered in five separate tracts. As he called for bids on each separate tract, Huston announced a starting or minimum bid. The only bidder at the sale was Adam, who offered bids well below the starting bid for each tract.

At the conclusion of the sale, Mike Moody, a rancher and official with the Purdum State Bank, delivered his personal check for $52,200 to the clerk of the sale, Howard Furgeson, and to Huston. This check recited bids of "$125" on Tracts 1 and 2 and "$75" on Tracts 3, 4, and 5, which were the amounts per tract bid by Adam. The memo portion of the check stated, "20% down on 2840 acres Fred J. Marten Estate."

Moody's involvement requires reference to exhibit 9, a document entitled "Agreement for Option to Purchase Real Estate," dated October 7, 1993. Moody is designated therein as "Seller," and Karl and Adam are designated as "Buyer[s]." This agreement recites:

Seller and Buyer had on September 29, 1993 made an oral agreement that Adam J. Marten would bid at the sale of the real property of the Estates of Fred Marten and Ruthanna Marten on September 30, 1993 for Michael L. Moody as real purchaser, who would pay the consideration for the purchase, and in whose name the real property would be placed as buyer . . . .

This October 7 agreement further provided that Moody, the "real purchaser," granted "an option to buy the premises" to Karl and Adam on terms conforming to the terms of the purchase "of the real estate by Michael L. Moody from the Estates of Fred Marten and Ruthanna Marten." The option is said to be "severable and may be exercised in whole or in part,"

although there is no evidence in the record that the option was ever exercised. Paragraph 13 of the agreement provides in part, "This option may be exercised by Buyer, jointly or severally, with prior ten day notice to the other buyer, by payment of the consideration and costs set out herein."

## TESTIMONIAL EVIDENCE

Moody testified that he made the downpayment at the sale and that the check was returned to him thereafter, but he is ready, willing, and able to perform the contract once marketable title is established. Moody admitted hearing Huston state that Adam's bids were inadequate and could not be accepted. Furgeson and Huston testified that Moody and Adam were told that the proffered check would not be cashed. The check was never presented for payment, and Huston returned the check to Moody with a letter dated December 8, 1993.

Karl testified that he had an option agreement to purchase the real estate and that he had financing for that purpose through the Purdum State Bank or Moody. Karl testified that he was "ready, willing and able to purchase this property under the option if the deed is delivered to Adam Marten from that sale." The parties then stipulated that Adam's testimony would be the same as Karl's as to the option agreement and that Adam "was the sole bidder at the sale."

Huston testified that when conducting sales such as the one on September 30, he believes it is necessary at the end of the auction to secure a written contract of sale from a successful bidder and that is his typical practice. No contract was executed in this instance.

## DISTRICT COURT DECISION

In this lawsuit by Karl and Adam, Karl claims "[t]hat by reason of the Option Agreement [he] has an interest in the sale of the premises to Adam J. Marten." The prayer of the petition asks that the court order that "the defendants and their attorney specifically perform the contract above–alleged upon tender by the plaintiffs of the final payment due under that contract."

After trial, the district court found in favor of Adam on his petition for specific performance and ordered the personal representatives to provide evidence of good title and, upon

payment of the balance of the amount bid on the five tracts, to deliver the deeds to the tracts of land to the highest bidder at the auction, Adam. The district court reasoned that a valid sale of the land had occurred at the auction, since the only bids made and "marked down" were those of Adam. The court further found that the auctioneer and clerk accepted a check for the 20 percent downpayment on the property and that the auctioneer also stated that the bids would be submitted to the county court for confirmation. However, the district court noted that the auctioneer's statement that the matter would be submitted to the county court for confirmation was a "condition" that was really a "noncondition," since the county court had no authority to accept or reject any bids. The district court further reasoned that there was no evidence that there was a "protected bid" or that the personal representatives were reserving the right to reject any bids below a certain amount and thus the property was to sell absolutely to the highest bidder. The district court concluded that the action of the auctioneer and the clerk in marking down Adam's bids and in accepting the check for the downpayment signified that the land had been sold. Finally, the district court determined that the statute of frauds was satisfied by Moody's check.

## STANDARD OF REVIEW

An action for specific performance sounds in equity. *Fritsch v. Hilton Land & Cattle Co.*, 245 Neb. 469, 513 N.W.2d 534 (1994). In an appeal of an equity action, an appellate court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court, provided, when credible evidence is in conflict on a material issue of fact, an appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Id.*

## ANALYSIS

*District Court Decree of Specific Performance.*

An auction is a public sale of property to the highest bidder by one licensed and authorized to do so and the goal is to obtain the best financial return for the seller by free and fair competition among bidders. 7A C.J.S. *Auctions and*

*Auctioneers* § 1 (1980). There are essentially two kinds of auctions: those "with reserve" and those "without reserve." Although not specifically so stated, the import of the district court's decision was that this auction was without reserve and that, as a consequence, the land had to be sold to Adam—the only, and necessarily the highest, bidder. The facts are essentially undisputed as to what happened and what was said at the auction held September 30.

Although there is not a decided Nebraska case which comprehensively discusses the nature of auctions, our review of the literature leads us to the conclusion that the law of auctions is rather well established and does not vary in any appreciable degree from jurisdiction to jurisdiction. Nebraska has statutory provisions governing the sale of goods by auction under the Uniform Commercial Code, see Neb. U.C.C. § 2–328 (Reissue 1992), but none specifically addressing sales of real estate which impact this case.

■ One of the most complete discussions of the law of auctions is found in *Pitchfork Ranch Co. v. Bar TL*, 615 P.2d 541 (Wyo. 1980), and we rely extensively on the detailed analysis of the Wyoming court. In an auction with reserve, the bidder is deemed to be the party making the offer while the auctioneer, as agent for the seller, is the offeree. *Id*. The ramification of a with reserve auction is that the principal may choose to withdraw the property at any time, before the hammer falls, and if the bidding is too low—the auctioneer need do nothing and there is no contract between the seller and the bidder. *Id*. See, also, 1 Corbin on Contracts, § 4.14 (Joseph M. Perillo rev. ed. 1993); 7A C.J.S., *supra*, §§ 1–27.

■ In contrast, an auction without reserve, or a no reserve auction, is where the legal relationship between the seller and the bidder is reversed. This is also called an "absolute auction." See 1 Corbin on Contracts, *supra*. See, also, *Holston v. Pennington*, 225 Va. 551, 304 S.E.2d 287 (1983) (holding that absolute auction is equivalent to auction without reserve). In the without reserve auction, the seller becomes the offeror and the bidder becomes the offeree by reason of the collateral contract theory. *Pitchfork Ranch Co., supra*. This role switching results in a significant readjustment of rights and obligations. For

26

example, in a without reserve auction, the contract is consummated with each bid, subject only to a higher bid being received because the seller makes his offer to sell when he advertises or announces the sale as a without reserve sale to the highest bidder. Consequently, the seller may not withdraw his property once any legitimate bid has been submitted, as he may do at any time before the hammer falls in a with reserve auction. In the without reserve situation, the seller is absolutely committed to a sale once a bid has been entered, no matter what the level of bidding is or the property's true value. *Id.* See, also, 7A C.J.S., *supra*, § 11. Accord, *Holston, supra*; *Zuhak v. Rose*, 264 Wis. 286, 58 N.W.2d 693 (1953); *Wilcher v. McGuire*, 537 S.W.2d 844 (Mo. App. 1976). In a without reserve auction, once one bid has been made the seller's offer to sell is held to be irrevocable. 1 Corbin on Contracts, *supra*.

▮ The collateral contract present in a without reserve auction is simply the owner's agreement with all potential bidders that he will not withdraw the property from sale, regardless of how low the highest bid might be, and therefore the highest bona fide bidder at an auction without reserve may insist that the property be sold to him or that the owner answer to him in damages. *Wilcher, supra*, citing *Drew v. Deere Co.*, 19 A.D.2d 308, 241 N.Y.S.2d 267 (1963).

▮ An auction is deemed to be conducted *with reserve* unless there is an express announcement or advertisement to the contrary before the auction takes place. *Ferry v. Udall*, 336 F.2d 706 (9th Cir. 1964), *cert. denied* 381 U.S. 904, 85 S. Ct. 1449, 14 L. Ed. 2d 286 (1965); *Chevalier v. Town of Sanford*, 475 A.2d 1148 (Me. 1984); 7A C.J.S., *supra*. When an auctioneer presents an article for sale, he ordinarily is not making an operative offer and such an auction is "with reserve." This is true even though the seller has advertised or made statements that the article will be sold to the highest bidder, as such statements are usually "merely preliminary negotiation, not intended and not reasonably understood to be intended to affect legal relations." 1 Corbin on Contracts, *supra* at 639–40.

What kind of auction was held on September 30 at the sale of the Marten ranch? The sale bill does not even advertise an auction, but, rather, advertises an "estate sale." The only terms

set forth are "20% down on date of sale. Balance upon confirmation by the Court. Possession March 1, 1994." The legal notice, published once a week for 4 weeks before the sale, simply says "public auction" and sets forth the same terms quoted above, but does not contain any characterization of the auction as "absolute" or "without reserve." The legal notice also states that the sale is authorized by the county court. Thus, on the basis of the sale bill and the legal notice, this certainly was not a without reserve auction. In *Holston v. Pennington*, 225 Va. at 557, 304 S.E.2d at 290, the court noted that the words " 'subject to seller's confirmation' " would have negated an auction without reserve if they had been uttered before the sale. However, in that case, at the time those words were uttered, an absolute auction had already been announced, conducted, and terminated, and therefore, the words were too late to have any effect. In *Wilcher v. McGuire*, 537 S.W.2d at 847, a sale advertised as "subject to confirmation by the owner" provided recognition of the fact that the owner had only authorized a " 'with reserve' " sale. In the instant case, the sale was clearly advertised as conditional, and it seems elementary that conditional sales are generally inconsistent with absolute auctions.

Huston began the sale with Tract 1, which was 640 acres known as the Marten home place. Before calling for bids, Huston stated, "We're going to open the bidding on Tract Number 1 at $200 per acre. That's our starting bid, $200 per acre." Karl stated, "I'll give you $125 for that." Huston advised that Karl's bid would not be accepted unless he submitted a letter of credit, which had not been done, and therefore Karl's bid was rejected. (There is no contention made in this appeal that Karl should have been allowed to bid.) At this point, Adam, Karl's son, bid $125, and Huston responded, "I can't accept that because our opening is $200 per acre." An exchange then occurred between Huston and Adam's attorney, Robert Wheeler, as to whether there was a bid in hand for $200 per acre, and Huston ultimately said, "The only one we have here is for $125. Adam, is that what you said? Alright. We'll move on to Tract Number 2 which is the north half of section 12." Huston stated, "We've agreed to start the bid on this tract of land which

includes irrigated crop land at $300 per acre. I will accept bids in multiples of five. Do we have any bids." Adam then bid $125 per acre for that tract. A discussion then ensued as to whether that bid was accepted, and Huston responded, "What do you want, Adam, I just said he marked it down. Does anyone make a bid other than the $125 that's been offered by Adam?"

Huston then offered Tract 3, stating, "The starting bid on Tract Number 3 is $100 per acre. Do we have any other bids?" Adam stated, "I bid $75 per acre." Huston responded, "Mark it down. Are there any other bids over $100 per acre? Seeing none, I'll move on to Tract Number 4." Huston described Tract 4 and stated, "We'll accept any bids over $100 per acre for this tract. Do we have any bids?" Adam stated, "$75 per acre," and Huston responded, "$75. Do we have any other bids?" Huston then offered Tract 5, stating, "We'll accept bids over $100 for Tract Number 5." Adam stated, "Bid $75 per acre," and Huston responded, "We have a bid that we've marked down for $75 per acre. Are there any other bids?"

At this point, Huston stated that he would declare a recess, come back, and go through the process again, but he stated:

I can tell you this, however, that none of the bids which have been submitted after this date will be confirmed by the court. You might keep that in mind when we come back. We'll take it for about 15 minutes.

. . . Folks, we're going to start in a few minutes but I'll have to tell you this, if we don't have any more strong enthusiasm than we had before we'll probably walk away from here without a sale. Right now the court won't confirm any of the bids. If you're interested in any of this property and you want to make a bid this is your chance to do it, and if you don't get the bids that we think are probable or reasonable it probably will not be confirmed by the court, so I just want you to understand we have gone to a lot of trouble and cost to produce this sale. And if we don't have any more enthusiasm than we've had we probably will not have a sale. OK, are you all ready to begin?

Then Huston was asked whether he was "saying that if [sic] you don't have the bids that you stated from the start?" Huston's

response was as follows:

HUSTON: We have bids that have been written down on paper but I can tell you that they, we would not ask that they be confirmed by the court, and I'm sure the court would not confirm them.

SALE ATTENDEE: We do have an opening bid, then, that you've stated on each tract?

. . . HUSTON: Yes. OK, with that in mind we'll start out with Tract Number 1, this is the home place. We have a bid I believe of $125. Do we have any other bids on Tract Number One? If we have anyone interested in that tract, please show me your card. Are there any other bids on Tract Number One?

SALE ATTENDEE: Can I ask a question?

. . . HUSTON: You may.

SALE ATTENDEE: Is your bidder at the sale today?

. . . HUSTON: No.

. . . WHEELER: That raises another question. I thought you said you had a bid of $125, is that Adams' [sic] bid?

. . . HUSTON: We have Adam's bid.

No further bids were received and Huston announced:

[HUSTON:] These bids have been recorded, they'll be reported to the court and we'll take no further bids. These bids have been recorded, they'll be reported to the court. I can assure you that probably the court will not confirm any of these because they are inadequate. If any of you are interested in purchasing any of this property in small tracts that we have here, it can be sold at a private sale and if you are please contact me or one of the co–personal representatives of the estate. Thank you all for coming.

. . . WHEELER: Mr. Huston, before you close,

. . . HUSTON: The sale has been open for an hour, and is now officially closed.

. . . WHEELER: Mr. Huston, I don't think it's been open an hour from the time you started the bidding[.]

. . . HUSTON: We started at . . .

. . . WHEELER: Well I know that's the time you started, but may I ask you, you had bids and from my

understanding it's an absolute sale. Are you then accepting the bids of Adam[?]

. . . HUSTON: First of all, it's not an absolute sale. What we've done, we've posted this, and we've told your [sic] several times "These bids will be submitted to the court and the court will either confirm or not confirm[.]"

. . . WHEELER: So are you saying you are accepting Adam's bid to submit to the court for confirmation?

. . . HUSTON: It's the only one we have to submit to the court so obviously since we have no other bids. We will submit it.

. . . WHEELER: Thank you.

. . . HUSTON: Thank you all for coming. The sale is adjourned.

Huston testified that he had established "starting bids" but admitted that he did not have in hand anyone willing to pay that price. In his testimony, Huston admits that at the sale he announced the "starting bid" on each tract which was not completely accurate because prior to the sale no one had actually bid on the land. Huston was asked what he meant when he announced, "there is no protected bid," and his response was that "the co-personal representatives of the estate were not going to bid personally on the sale." However, in his deposition, Huston answered the same question by stating, "I meant that we didn't have anybody that was going to protect the estate at all except the court." Huston testified that he did not accept any of Adam's bids, but, rather, "marked them down" by having the clerk of the sale record the bids made by Adam.

We find on our de novo review that there was no advertised or announced intention to sell the ranch without reserve or at absolute auction. The evidence in this regard is quite clear.

Neither the sale bill nor the published notice advertised an "absolute" auction or a "without reserve" auction. We next look to the statements of Huston before bidding began. The principal statement of Huston relied upon by the appellees to show a without reserve auction is: "This will be an auction with no protected bids, however, the sale is upon authority of the county court . . . ." This statement must be reviewed with reference to the totality of the circumstances. Before the bidding began,

Adam asked, "[I]s this an absolute sale?" Huston did not respond affirmatively, but, rather, stated, "This is a sale subject to confirmation by the court, as I just read. It will have to be approved by the county court." If this answer, clearly setting forth a condition of sale, does not negate any notion that this was an absolute or without reserve auction, then the announcement, before the bidding began, of the need for bids above the "starting bids" surely does so.

It makes no difference whether the sellers set starting bids, announced that they would not accept Adam's bids, or said that the sale was subject to confirmation by the court. The fact of the matter is that there was never any expressed intention or promise by Huston to hold an unconditional, absolute, or without reserve sale of the land to the high bidder on September 30, irrespective of the price bid for the land. The personal representatives on two occasions stated, through their agent, that it was not an absolute sale, advised what the "floor" was in terms of price for each tract, and stated that although they would submit Adam's bids to the court (which they probably were not obligated to do under the law of auctions), Huston nonetheless announced that they would not ask the court to confirm the bids. Finally, they asked those in attendance to contact them about a private sale. We find it difficult to conceive how it could be more clear that this was not an absolute, or without reserve, auction.

In this trial, the principal witness for Karl and Adam was Allan D. Woodward, a Broken Bow resident who has been an auctioneer nearly 33 years, handling both personal and real property. Bearing in mind the comments of Huston during the auction, we quote the following testimony from Woodward, elicited by the trial judge:

> Q Okay. If I'm going to run an auction and say there are no protected bids, and I say I have a starting bid of a thousand dollars, and somebody bids $995, do I have to accept that bid?
>
> A No.
>
> . . . .
>
> Q . . . Let me back–up. I may not have asked that question very artfully: If I say this is not a protected bid

sale, and I say, instead of saying I have a starting bid of X, I say "I will open the bidding at X" and somebody comes in below that, do I have to accept that bid?

A No.

We contrast the facts of this case with those of *Pitchfork Ranch Co. v. Bar TL*, 615 P.2d 541 (Wyo. 1980), which was unquestionably a without reserve auction. In *Pitchfork Ranch Co.*, Jerry Housel was selling the 70,000–acre Bar TL Ranch, and the brochure circulated to prospective bidders contained the following language: " '[The] 70,000 acre BAR TL RANCH properties will be offered at public auction by KENNEDY & WILSON AUCTIONEERS, INC., of Los Angeles, California in cooperation with George McWilliams, Auctioneer, Bozeman, Montana. *There will be no minimums and no reserves. . . .*' " (Emphasis in original.) *Id.* at 544. The Wyoming court also recited that advertising placed in newspapers around the world stated that the sale was an " 'absolute no minimum auction.' " *Id.*

Pitchfork Ranch was the second highest bidder at the auction and sued for specific performance. Housel, doing business as the Bar TL Ranch, had secured an assignment of the rights of the highest bidder as a solution to the problem described by the Wyoming court in the following terms:

In the no–reserves situation, the seller is absolutely committed to the sale once a bid has been entered, no matter what the level of bidding or the seller's notion of the property's true value. This is the catastrophic situation in which Housel found himself where $4,000,000.00 worth of his property was being bid at the $1,600,000.00 level. He could not extricate his property from the sale because he had committed it to sale to the highest bidder (no matter how low the bid)—but that was his only commitment—that he would sell to the highest bidder. He was not committed to selling to the next highest bidder.

(Emphasis omitted.) *Id.* at 549. Housel and the Bar TL did manage to extricate themselves from this catastrophe because they had acquired the rights of the high bidder, under an arrangement undisclosed in the Wyoming court's opinion, and thus Pitchfork Ranch did not get the Bar TL. The instant case

is factually dissimilar from *Pitchfork Ranch Co.*, although the law extensively discussed and analyzed therein is applicable. Moreover, the facts of *Pitchfork Ranch Co.* are instructive on what is said or done before bidding begins in order to create an absolute auction. Since the seller is at the mercy of an uncertain bidding process, which may or may not be fair and open, it is logical that there be clear intent and express designation as such before absolute, or without reserve, auctions are held to have occurred. This is not present in the instant case.

Fundamental to a decree of specific performance is a meeting of the minds of the parties to the contract. *Horn v. Stuckey*, 146 Neb. 625, 20 N.W.2d 692 (1945). At the most elemental level, there was no meeting of the minds here. A with reserve auction was clearly conducted on September 30, and Adam's bids were all below the clearly announced bidding floor for each tract. There is no evidence of the sellers' acceptance of Adam's bids for any purpose except for submission to the county court, an unnecessary procedure in any event, since in a with reserve auction the sellers can reject—which was done in several different ways by Huston. Huston told Adam that they would not ask for confirmation and that the bids were inadequate. To establish a contract capable of specific enforcement it must be shown that there was a definite offer and an unconditional acceptance. *Satellite Dev. Co. v. Bernt*, 229 Neb. 778, 429 N.W.2d 334 (1988). Unconditional acceptance of Adam's bids is absent, and thus, there was no sale.

Even if one could find a meeting of the minds and thus a sale, which we cannot, we nonetheless also reject the district court's conclusion that there was compliance with the statute of frauds. *Benson v. Ruggles & Burtch v. Benson*, 208 Neb. 330, 303 N.W.2d 496 (1981), held that a memorandum of sale or contract must be signed by the seller in an auction sale of real estate in order to comply with the statute of frauds. The personal check proffered and signed by Moody does not meet that requirement in any way. It was received by Huston with the statement that it would not be presented for payment; it was not so presented and was returned. Given the peculiar facts of Moody's involvement, we are uncertain what status to assign to him. However, we at least know that he was not the seller.

Nothing was signed by the seller, the personal representatives, or their agent, Huston, to bind them to a sale.

## CONCLUSION

We have found that this was not an absolute or without reserve auction; therefore, the sellers were free to reject Adam's bids, which they unquestionably did. Since unconditional acceptance by the sellers in a with reserve auction is necessary to decree specific performance, it naturally follows that the district court erred in granting specific performance.

REVERSED.