Rockingham County Probate Court
No. 2007-249

RICHARD N. FOLEY

v.

TIMOTHY S. WHEELOCK

Argued: March 20, 2008
Opinion Issued: May 30, 2008

*Richard N. Foley*, by brief and orally, *pro se.*

*Boynton, Waldron, Doleac, Woodman & Scott, P.A.*, of Portsmouth (*William G. Scott* on the brief and orally), for the respondent.

BRODERICK, C.J. In this action to partition real property, the petitioner, Richard N. Foley, appeals an order of the Rockingham County Probate Court (*O'Neill*, J.) allowing the respondent, Timothy S. Wheelock, to purchase the subject property after an unsuccessful public auction at a lower price than the court-ordered reserve. Foley also challenges an order requiring him to subsidize Wheelock's rental of an off-site office during the pendency of the sale. We affirm.

I

The record reveals the following. In 1997, the parties purchased an office condominium in downtown Portsmouth as tenants-in-common for $75,000. They used the premises to house their respective law offices. In December 2005, as an apparent result of deteriorating relations between the parties, Foley filed a petition requesting a court-supervised partitioning of the condominium. *See* RSA 547-C:25 (2007). In March 2006, before the probate court acted upon the petition, Wheelock moved his office to another location.

In early June, following a hearing, the probate court granted the petition to partition. In so doing, it found "no cause to award one party more than one-half the equity in the unit," and that "[the parties] should both be afforded the opportunity to purchase the property." While Foley had asked to be allowed to purchase the condominium for $139,000, the court credited expert testimony presented by Wheelock that the fair market value of the property was $179,000. It entered the following order:

1. The parties may agree to a private auction . . . with a reserve price of $159,000.

2. If the parties do not agree to a private auction, the property will be sold through a public auction. The parties may agree upon a reserve and method of sale for the public auction. If they cannot agree [upon a reserve price], the reserve will be $179,000 and the court will appoint a commissioner to sell the property at auction, the commissioner's fees to be paid equally by the parties out of the proceeds from the sale of the property.

3. After the property is sold . . . the proceeds will be divided equally between the parties except that from [Foley's] one-half share, [Wheelock] will be paid $409.55 [for overdue utility bills] and $325 monthly from April 1, 2006 until the sale of the property, to be prorated as of the date of the sale.

The $325 figure referenced by the court represented one-half of Wheelock's monthly rent at his new office space.

By September, the parties had not reached an agreement on the method of sale for the condominium. Consequently, the following month, the court ordered them to sell the condominium at public auction as contemplated by its June order. The court also appointed an auctioneer, who subsequently scheduled an auction for November 16 and took steps—such as advertising the unit—to prepare for the sale.

On November 1, however, Wheelock filed a "Motion to Compel Compliance," claiming that Foley had failed to pay certain fees to the auctioneer, removed a sign outside the unit advertising the auction, and had generally interfered with efforts to facilitate a "commercially reasonable sale" of the property. During a telephonic hearing on November 3, Foley represented to the court that he was unable to pay the auctioneer's fee because he had just $400 in the bank. In its order on Wheelock's motion, the trial court ruled that Foley's share of the auctioneer's fee could be deducted from his share of the proceeds of the sale. The court further ordered Foley to ensure the unit was clean and free of clutter and to return the sign advertising the auction. Wheelock was awarded requested attorney's fees.

On November 16, five qualified bidders participated in the public auction, which was held outside the unit. Foley, who represents in his brief that he "was unable to obtain a loan sufficient to enable him to buy the property for [the reserve price] of $179,000[ ]," did not participate. The high bid at the auction of $140,000 was made by Wheelock. Because this bid was below the court-ordered reserve, the auction concluded without the condominium having been sold.

Wheelock subsequently filed a motion to modify the probate court's original order on the petition to partition, seeking a waiver of the $179,000 reserve price and requesting that the court accept his bid to purchase the unit for $140,000. The probate court held a hearing on the motion in March 2007. Wheelock contended that the results of the auction revealed the actual fair market value of the condominium and that the court should let him acquire it for $140,000. Foley objected, arguing that he had relied upon the reserve price to his detriment when seeking financing. He also represented to the court that a friend of his was willing to loan him $145,000 to purchase the unit and that he could produce the funds within five days. Foley agreed, however, that if he could not do so, the property could be sold to Wheelock for $140,000. Notwithstanding his representation that he would be able to purchase the property, Foley was, at that time, two months in arrears on his mortgage payments, and admitted that he was unable to secure financing from a bank for an amount greater than Wheelock's bid of $140,000.

On March 8, the probate court, apparently discrediting Foley's representation that he could acquire $145,000 from his friend, made the following findings:

> Based upon the evidence offered, the court finds that the property was adequately advertised for sale by auction on November 16, 2006. The court further finds that [Foley] had more than sufficient time between the court order of June 1, 2006 and the date of the auction to seek financing so that he could bid on the property, but failed to do so. [Wheelock] was able to prepare himself for bidding at the auction and did so. The result of the advertising and public auction yielded a high bid of $140,000 with the next highest bid being $130,000. On that basis it is reasonable to conclude that the fair market value of the property at the time of the auction was $140,000 and to require further auctioning or listing of the property would cause unnecessary cost and delay to the parties.

The court consequently entered an order stating that the reserve price "set forth in the Court Order of June 1, 2006 is waived and . . . Wheelock is allowed to purchase the property for $140,000." This appeal followed.

## II

Foley first challenges the portion of the probate court's June 2006 order requiring him to pay one-half of Wheelock's monthly rent for his new office space until their condominium was sold. Wheelock, in turn, challenges the timeliness of Foley's appeal of this issue. *See* SUP. CT. R. 7(1)(A). However, we assume, without deciding, that Foley's appeal was timely. *Cf. In re Estate of Heald*, 147 N.H. 280, 281-82 (2001) (order which terminates matter generally constitutes final decision ripe for appeal). We thus turn to the merits of Foley's claim.

In partition proceedings, the probate court sits as a court of equity. RSA 547-C:25; *see also* RSA 547-C:30 (2007) (partition proceedings "remedial in nature"; provisions of RSA chapter 547-C to be "liberally construed in favor of the exercise of broad equitable jurisdiction"). "The propriety of affording equitable relief in a particular case rests in the sound discretion of the trial court . . . ." *Decker v. Decker*, 139 N.H. 588, 590 (1995) (quotation omitted). We, in turn, review an equitable order for an unsustainable exercise of discretion. *Id.*; *Blagbrough Family Realty Trust v. A & T Forest Prods.*, 155 N.H. 29, 46 (2007). The party asserting that a trial court order is unsustainable must demonstrate that the ruling was unreasonable or untenable to the prejudice of his case. *Poland v. Twomey*, 156 N.H. 412, 415-16 (2007).

"An action for partition calls upon the court to exercise its equity powers and consider the special circumstances of the case[ ] in order to achieve complete justice." *DeLucca v. DeLucca*, 152 N.H. 100, 102 (2005). RSA 547-C:29 (2007) provides:

> In entering its decree [on a petition to partition] the court may, in its discretion, award or assign the property or its proceeds on sale as a whole or in such portions as may be fair and equitable. In exercising its discretion in determining what is fair and equitable in a case before it, the court may consider: the direct or indirect actions and contributions of the parties to the acquisition, maintenance, repair, [and] preservation . . . of the property; the duration of the occupancy and nature of the use made of the property by the parties; . . . waste or other detriment caused to the property by the actions or inactions of the parties; . . . and any other factors the court deems relevant.

Foley contends that when crafting its partition decree, the probate court had "no basis in fact or law to assign half of [Wheelock's] new rent to be paid from the proceeds of [Foley's] half of the sale of the property." We disagree.

The record shows that Wheelock vacated the parties' condominium approximately eight months before the unit was auctioned, and one year before the court issued an order enabling him to purchase it. During that time, he continued to pay one-half of the mortgage on the property and utility bills. Moreover, the trial court had ample evidence before it to conclude that Foley's behavior necessitated Wheelock's relocation of his law practice. As Wheelock testified:

> There was my concern with . . . Mr. Foley living in Maine and registering [his] motor vehicles to the office or my suspicion that that had occurred. . . .
>
> There were just—Mr. Foley and I are complete opposites. Sometimes that works out. It wasn't working here. I was very concerned with his ethics and how his actions might affect me.
>
> . . . .
>
> He would not listen to me on the subject of not bringing his German [Shepherd] dog into the office, who has allegedly bitten or attempted to bite clients . . . .

Wheelock also testified that Foley had monopolized his secretary, moved an excessive amount of furniture into his portion of the office, and "dismantled" his phone system. In sum, Wheelock believed it was a "deteriorating, unprofessional environment."

■ On this record, we cannot conclude that the probate court unreasonably or untenably reduced Foley's share of the proceeds of the condominium sale by an amount equal to one-half of Wheelock's rental payments during the pendency of their partition action. Indeed, we find entirely sustainable the trial court's decision to offset Wheelock's ongoing mortgage payments on a property he was unable to use freely. The trial court utilized the factors set forth in RSA 547-C:29 when crafting its order, and there is ample support in the record for its equitable division of the property.

## III

Foley next contends that the probate court erred by accepting Wheelock's offer to pay $140,000 for the parties' condominium. We note that Foley does not challenge the probate court's conclusion that this figure represented the fair market value of the property. Accordingly, we need not decide whether the court properly relied upon the high bid at auction to establish fair market value. *But cf. Society Hill at Merrimack Condo. Assoc. v. Town of Merrimack*, 139 N.H. 253, 255-56 (1994) (discussing factors to be considered when determining fair market value). Instead, Foley relies upon equitable arguments alone, maintaining that "[i]t was disingenuous for [Wheelock] . . . to not bid the reserve that he had insisted upon," and that "[t]here was no rational or legitimate basis for awarding the property to [Wheelock] for $140,000[ ] . . . ."

"An auction is a public sale of property to the highest bidder by one licensed and authorized to do so and the goal is to obtain the best financial return for the seller by free and fair competition among bidders." *Marten v. Staab*, 537 N.W.2d 518, 522 (Neb. Ct. App. 1995), *aff'd*, 543 N.W.2d 436 (Neb. 1996). There are generally two methods of selling property at an auction: "with reserve" or "without reserve." *Pyles v. Goller*, 674 A.2d 35, 40 (Md. Ct. Spec. App. 1996); *see generally Society Hill*, 139 N.H. at 256 (discussing a "no reserve" auction). In an auction "without reserve," also called an "absolute" auction, the auctioneer makes an offer to sell to the highest bidder at whatever price he may bid. *Pyles*, 674 A.2d at 40. In contrast,

> [i]n an auction held "with reserve," an auctioneer's bringing a piece of property up for bid is an invitation to make a contract, and is not an offer to contract. One of the distinguishing features of an auction held "with reserve" is that the owner reserves the right not to sell the property, and can withdraw the property from the auction before the acceptance of the highest bid.

*Id.* (citations and emphasis omitted); *see also* RSA 382-A:2-328(3) (1994) ("In an auction with reserve the auctioneer may withdraw the goods at any

time until he announces completion of the sale."). "The ramification of a with reserve auction is that the principal may choose to withdraw the property at any time[ ] before the hammer falls, and if the bid is too low—the auctioneer need do nothing and there is no contract between the seller and the bidder." *Marten*, 537 N.W.2d at 523; *accord Towle v. Leavitt*, 23 N.H. 360, 372 (1851).

Conversely, Foley cites no law—and we have found none—that prevents a seller, after having held a "with reserve" auction at which the reserve price was not met, from subsequently accepting a sub-reserve offer for his property. In such circumstances, a sale may still be consummated by the seller's acceptance of an offer. *Pitchfork Ranch Co. v. Bar TL*, 615 P.2d 541, 547-48 (Wyo. 1980); *see generally Chisholm v. Ultima Nashua Indus. Corp.*, 150 N.H. 141, 144-45 (2003) (outlining principles of contract formation). In other words, while a seller whose reserve price has not been met at auction is under no further obligation to complete the transaction, this does not mean the seller cannot subsequently accept a sub-reserve price if he so chooses.

With these principles in mind, we note that the portion of the probate court's order waiving the reserve price it had set for the November 2006 auction, while responsive to Wheelock's motion to modify, was unnecessary for a subsequent sale to occur. *Cf.* 7A C.J.S. *Auctions and Auctioneers* §§ 37, 40 (2004) (discussing the fixing of a minimum price). After the November 2006 auction produced only bids below the $179,000 reserve, the "with reserve" auction was terminated and the court—like any other seller—had full discretion to accept any sub-reserve offer that remained available. Therefore, we view the hearing on Wheelock's motion as, in essence, a discussion among the stakeholders about whether Wheelock's offer to purchase the property for $140,000 was acceptable. Our inquiry, in turn, is whether the probate court's decision to accept Wheelock's offer was a sustainable exercise of discretion.

█ In this case, at Foley's request, the probate court stood charged with equitably disposing of the parties' condominium. In that capacity, it attempted to guarantee the highest price possible for the parties by setting a reserve price on the high end of the spectrum proffered by the parties' appraisers. Ultimately, after the "with reserve" auction ended unsuccessfully, the court accepted an offer below the reserve price it had initially set for the auction. We find ample support in the record for its decision to do so.

At the hearing on the motion to modify, the court received evidence that the City of Portsmouth had recently assessed the unit at approximately $125,000. Wheelock also represented that his appraiser had noted a

downturn in the Portsmouth commercial real estate market from the time of the court's June 2006 order to the time of the March 2007 hearing. Regardless, at the initial hearing on his petition, Foley himself had proposed that a fair valuation of the condominium would have been just $139,000. He also stated at the March 2007 hearing that if he could not raise $145,000, he would not object to a sale to Wheelock for $140,000. Moreover, there were a number of qualified bidders at the auction, which the probate court found to have been sufficiently advertised. This suggests a "free and fair competition," *Marten*, 537 N.W.2d at 522, took place to achieve the greatest possible sale price.

The fact that Wheelock's bid of $140,000 turned out to be the accepted offer, even though he had proposed a reserve price of $179,000, does not undermine this conclusion. Wheelock's request for a high reserve was based upon an appraiser's opinion and simply reflected a desire to sell the condominium at what he then believed was its fair market value. Contrary to Foley's argument, we see no reason why Wheelock should have been required to enter any particular minimum bid, unwarranted by the competition at the auction, once he stepped into the role of a potential buyer. In fact, had Wheelock been compelled to bid higher than he did, this would have effectuated an artificial, and likely prohibited, "puffing" of the price of the condominium. *See Towle*, 23 N.H. at 367-68; *Pyles*, 674 A.2d at 42 n.9. Foley's characterizations of Wheelock's bid as "disingenuous" and an "underbid" are inapt.

We acknowledge Foley's claims that he "detrimentally" relied upon the court-ordered reserve price when seeking financing prior to the auction, and that his application for a $185,000 mortgage was denied. Nothing prevented Foley, however, from obtaining as much financing as he could and submitting as high a bid as was within his means—even if that bid was below the reserve price. The same was true for all potential bidders. A reserve price is not an immoveable minimum price at which bidding must start; it acts only as a floor below which bids need not be automatically accepted by the seller. Thus, because it is essentially just an "asking" price the seller hopes to attain, the reserve, even if it has been publicized, cannot be viewed as prohibitive of entry into an auction. We therefore do not agree with Foley that he—or anyone else, for that matter—was somehow "precluded . . . from bidding" by the reserve set by the court, or that it was even possible for him to "detrimentally" rely upon it when seeking financing.

Finally, it was fully within the probate court's discretion to discredit and reject, *see Society Hill*, 139 N.H. at 256, Foley's post-auction representation that he could suddenly obtain $145,000 to purchase the unit within five days, given: (1) Foley's repeated claims of indigence; (2) his failure to pay

the mortgage on the condominium; (3) his failure to pay Wheelock's attorney's fees as ordered in November 2006; and (4) his inability to secure bank financing during the months leading up to the auction. In addition, contrary to Foley's claim, our review of the record reveals no agreement by the probate court to grant Foley the five additional days he requested to attempt to secure such financing. Regardless, if Foley's request had been accommodated, it would have converted the hearing on Wheelock's motion into an impromptu private auction between the parties for which Wheelock was not necessarily prepared. As the probate court observed, Foley had ample time to prepare himself for the court-sanctioned public auction in November 2006 and should have done so. The probate court was under no obligation to believe that Foley could secure the needed financing which had consistently eluded him.

Accordingly, since the probate court could have reasonably concluded that Wheelock's post-auction offer of $140,000 represented the maximum price the parties' condominium would sell for, it acted sustainably when accepting that offer. We find no grounds for overturning the court's implicit conclusion that the purpose of the auction it had ordered—to obtain the best possible financial return for the parties on the sale of their condominium—had been fulfilled.

*Affirmed.*

DALIANIS, DUGGAN, GALWAY and HICKS, JJ., concurred.