IN THE SUPREME COURT OF THE STATE OF IDAHO

**Docket No. 36940**

| | | |
|---|---|---|
| JON WAKELAM, an individual; and MIKE RESSLER, an individual doing business as M&M RE Holdings, | ) ) ) ) | |
| | | Boise, February 2011 Term |
| Plaintiffs-Appellants, | ) ) | 2011 Opinion No. 100 |
| v. | ) ) | Filed: October 28, 2011 |
| THOMAS A. HAGOOD, an unmarried man, | ) ) | |
| | ) | Stephen Kenyon, Clerk |
| Defendant-Third Party Plaintiff-Respondent, | ) ) ) | |
| and | ) ) | |
| BULLOCK AND COMPANY REALTORS L.L.C., an Idaho limited liability company, SCOTT BULLOCK, an individual, BILL DOWNS AUCTION SERVICE INC., an Idaho corporation, and LARRY DOWNS, an individual, | ) ) ) ) ) ) ) | |
| Defendants-Third Party Defendants. | ) | |

Appeal from the District Court of the Third Judicial District of the State of Idaho, Canyon County, Hon. Renae J. Hoff, District Judge.

The decision of the district court is <u>reversed</u> and the case is <u>remanded</u>.

Givens Pursley LLP, Boise, for appellants. Thomas E. Dvorak argued.

Davison, Copple, Copple & Copple, Boise, for respondent. Alexander P. McLaughlin argued.

_____

J. JONES, Justice

Jon Wakelam and Mike Ressler attended an auction of three parcels of property owned by Thomas Hagood that was conducted by Bullock and Company Realtors (Bullock) on August 6, 2008. The auction was advertised as an absolute auction with a variety of terms and conditions for bidders. Wakelam and Ressler offered the high bids, totaling $973,035 for the

three parcels. When Hagood was approached with the purchase and sale agreements, he refused to sign them. He claimed he had no intention to sell the properties for less than $2,000,000.

Wakelam and Ressler brought suit against Hagood, arguing that the auction sale was enforceable. They later amended the complaint to include a claim that Hagood violated the Idaho Consumer Protection Act (ICPA) and attempted to further amend the complaint to seek a declaratory judgment that Bullock, as agent for Hagood, had authority to sign the purchase agreements. The district court granted Hagood's motion for summary judgment and dismissed Wakelam's and Ressler's claims. The district court denied Wakelam's and Ressler's second motion to amend their complaint, finding that even if their claims were proven, they would not have been entitled to relief. Wakelam and Ressler now appeal. We reverse.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Thomas Hagood is the owner of three pieces of property in Nampa, Idaho. On June 9, 2008, Hagood signed an Exclusive Seller Representation Agreement with Bullock. The agreement between Hagood and Bullock specified that the three parcels would be sold at an absolute auction on August 6, 2008, and authorized Bullock to organize and advertise the auction. Hagood admits that his understanding of an absolute auction was that "[y]ou had to sell it." Hagood additionally claims that he never intended to sell the property for less than $2,000,000, although this does not appear in the Representation Agreement. The auction was advertised as an absolute auction and the advertisements included a list of terms and conditions for potential bidders. The terms and conditions specified the down payment required for the parcels, described the financing terms, the closing date, and the procedure for the transfer of title.

Hagood states that he attempted to place a reserve on the auction and, in speaking with Larry Downs of Bill Downs Auction Service (Bill Downs), decided that he did not want to go through with the auction and told Mr. Downs as much. He reports that he was talked out of canceling the auction. Hagood also reports that he again attempted to add a reserve the day before the auction in another meeting with Larry Downs. Hagood states that Downs "went ballistic" when Hagood tried to add a reserve but that Hagood did not revoke Downs' authority to proceed with the auction.

The auction took place as advertised on August 6, 2008. The auctioneer recorded the various bids. Ressler was the high bidder for the first two parcels at $278,250.00 and $241,500.00. Wakelam was the high bidder for the third parcel at $453,285.00. Following the

auction, Bullock drafted Purchase and Sales Agreements for each of the parcels. Wakelam and Ressler signed the Purchase and Sale Agreements. However, Hagood refused to sign and left the auction site.

Wakelam and Ressler filed suit, seeking specific performance and damages arising from Hagood's failure to abide by the results of the auction. Hagood, in turn, raised third-party claims against Bullock, Scott Bullock, Bill Downs, and Larry Downs (collectively the auctioneers). Wakelam and Ressler subsequently sought to amend their complaint to include a count alleging violations of the ICPA by all of the defendants, and the court granted this motion to amend. Both parties moved for summary judgment. On May 21, 2009, the district court heard oral argument and ruled in favor of Hagood, finding that none of the writings satisfied the statute of frauds and, therefore, the contract was unenforceable. The district court further found that the part performance and mutual acknowledgement exceptions to the statute of frauds did not apply to the facts alleged by Wakelam and Ressler.

On July 23, 2009, the district court again heard argument, this time regarding Wakelam's and Ressler's Second Motion to Amend, which sought to add a count to the complaint for a declaratory judgment allowing the auctioneer to sign a memorandum conforming to the statute of frauds and a second count alleging that the auctioneers were negligent in conducting the auction. The district court also heard argument on Wakelam's and Ressler's ICPA claim. The court dismissed the ICPA claim, finding that the claim was fundamentally part of their contract claim and that they had alleged no damages as required by the statute. The court further denied the motion to amend,[1] finding that the declaratory judgment sought would infringe the powers of the legislature.

On August 6, 2009, the district court entered judgment against Wakelam and Ressler and dismissed the claims against Hagood. Wakelam and Ressler timely appealed.

## II. STANDARD OF REVIEW

"When reviewing a motion for summary judgment, this Court uses the same standard employed by the trial court when deciding such a motion." *Stoddart v. Pocatello Sch. Dist. No. 25*, 149 Idaho 679, 683, 239 P.3d 784, 788 (2010) (quoting *Kolln v. Saint Luke's Reg'l Med. Ctr.*, 130 Idaho 323, 327, 940 P.2d 1142, 1146 (1997)). Summary judgment is proper "if the

---

[1] The motion was only denied as to Hagood. As the auctioneers did not challenge the motion, the district court allowed the amendment as to the other defendants.

pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." I.R.C.P. 56(c). "Disputed facts should be construed in favor of the non-moving party, and all reasonable inferences that can be drawn from the record are to be drawn in favor of the non-moving party. This Court exercises free review over questions of law." *Vavold v. State*, 148 Idaho 44, 45, 218 P.3d 388, 389 (2009) (quoting *Armstrong v. Farmers Ins. Co. of Idaho*, 147 Idaho 67, 69, 205 P.3d 1203, 1205 (2009)).

## III. ANALYSIS

### A.   The Fact That a Case Involves An Auction Does Not, By Itself, Take a Sale of Land Outside the Statute of Frauds.

Idaho Code § 9-503, Idaho's codification of the statute of frauds for real estate transactions, states:

> No estate or interest in real property, other than for leases for a term not exceeding one (1) year, nor any trust or power over or concerning it, or in any manner relating thereto, can be created, granted, assigned, surrendered, or declared, otherwise than by operation of law, or a conveyance or other instrument in writing, subscribed by the party creating, granting, assigning, surrendering or declaring the same, or by his lawful agent thereunto authorized by writing.

"Failure to comply with the statute of frauds renders an oral agreement unenforceable both in an action at law for damages and in a suit in equity for specific performance." *Hoffman v. SV Co., Inc.*, 102 Idaho 187, 190, 628 P.2d 218, 221 (1981). It is uncontested that this suit involves an interest in property.

> Against this are the legal principles regarding without reserve or absolute auctions.

> In an auction held without reserve, the opening of bids by the auctioneer constitutes a firm offer, as opposed to an invitation to make an offer. The seller, in such instances, promises to sell to the highest bidder and such promise is irrevocable after one bid has been made. The term "without reserve" are words [sic] of art and mean that, in making such an announcement, the owner enters into a collateral contract with all persons bidding at the auction that he or she will not withdraw the property from the sale, regardless of how low the highest bid may be.

7A C.J.S. *Auctions and Auctioneers* § 29. As discussed below, courts have reached different conclusions with regard to the relationship between the statute of frauds and without reserve auctions.

Wakelam's and Ressler's core argument is that Idaho Code § 9-503 does not apply to an absolute auction of real property because the definitions of an absolute auction preclude the

- 4 -

events that transpired here. However, that argument effectively ignores the statutory requirements of the statute of frauds. There is no basis, on the face of the statute, for ignoring the statute of frauds in an auction context. The cases from other jurisdictions upon which Wakelam and Ressler rely include *Pillsbury v. McNabb*, 37 Pa. D. & C.2d 283, 1965 WL 8189 (Pa. Ct. Comm. Pl. 1965); *Pyles v. Goller*, 674 A.2d 35 (Md. Ct. App. 1996); and *Zuhak v. Rose*, 58 N.W.2d 693 (Wis. 1953). None of these suggest a strong reason for ignoring the statute of frauds beyond the general maxim, adopted by this Court as well, that "equity will not permit the statute [of frauds] to be used as an instrument or means of effecting that which it was designed to prevent." *Anselmo v. Beardmore*, 70 Idaho 392, 396, 219 P.2d 946, 949 (1950).

The analysis in these cases does not generally specify that the parties had executed an enforceable contract. Rather, they hold that equity will not preclude a court from ordering that the seller be required to sign a memorandum that would satisfy the statute of frauds. For example, in *Pyles*, the Maryland court stated that:

> in an auction held "without reserve," mutual assents are achieved in succession as each next high bid is made, and final mutual assent and a final enforceable contract comes into existence when the last high bid is made. Once final mutual assent is achieved, the statute of frauds merely requires that the parties sign a memorandum encompassing all the elements of a contract.

674 A.2d at 43. Likewise, in *Pillsbury*, the Pennsylvania court stated:

> Plaintiff's cause of action is not based upon an oral contract for the sale of real estate. It is based, instead, upon defendants' violation of his duty, whether imposed by rule of law or by collateral agreement, to permit the auction to be completed by sale to the highest bona fide bidder and to refrain from withdrawing the property before such had been done. If such an action is to be barred by the statute of frauds, the effect of an auction without reserve will be nullified for all practical purposes whenever the property being offered for sale is the subject of a statute of frauds.

37 Pa. D. & C.2d at 289, 1965 WL 8189 at *4. Analogizing Wisconsin's statutory provisions relating to the auction of goods to auctions for land, *Zuhak* held that "[d]efendant discharged the auctioneer, thereby revoking his authority to give any memorandum and defendant left the scene. Under the circumstances he cannot complain that plaintiff has no memorandum." *Zuhak*, 58 N.W.2d at 697.

There is also substantial authority to support Hagood's contention that failure to comply with the statute of frauds bars enforcement of the auction agreement. In 1821, the court of appeals of Kentucky stated that because the statute of frauds "contains no exception of sales at

auction, . . . the entry in the books of the trustees, unless signed by the trustees, or some person authorized by them, is not a compliance with the requisitions of the statute . . . ." *Thomas' Executrix v. Trustees of Harrodsburg*, 3 A.K. Marsh. 298, 1821 WL 1067 at *2 (Ky. Ct. App. 1821). In *Holston v. Pennington*, 304 S.E.2d 287, 291 (Va. 1983), the Supreme Court of Virginia found that a notation made by the auctioneer during the auction was sufficient to satisfy the statute of frauds but nevertheless required that the statute be satisfied before a sale of real property at auction.[2] Although the bids were tallied in this case, those tallies were not signed and make no reference to their status as bid tallies. Further, Wakelam and Ressler have not argued that these tallies satisfy the statute of frauds.

Hagood principally relies upon a Nebraska case, *Benson v. Ruggles*, 303 N.W.2d 496 (Neb. 1981), and an Arizona case, *Del Rio Land, Inc. v. Haumont*, 574 P.2d 469 (Ariz. Ct. App. 1978). *Benson* noted that "conflicting testimony in this case over what was said by the auctioneer is a good illustration of the necessity for the statute of frauds. We judicially notice that auctions are generally not quiet affairs. They carry with them the potential for misunderstandings. Statements made are not recorded." *Benson*, 303 N.W.2d at 500. *Del Rio Land* stated:

> We cannot consider that the failure of the auctioneer to make a memorandum was immaterial, since to so hold would have the effect of rendering the Statute of Frauds inapplicable to auction sales, contrary to the universally accepted view in that regard. *See* 7 Am.Jur.2d, *Auctions and Auctioneers,* § 34; Restatement [First] of Contracts, § 212 . . . .

574 P.2d at 475-76. This statement is not entirely accurate as the *American Jurisprudence* section in question does not weigh on the statute of frauds and that treatise later cites *Zuhak* for the proposition that "[w]here the sale is without reserve and the right to withdraw the property does not exist after a bid has been made, the highest bidder may specifically enforce the acceptance of his or her bid and a transfer of the property pursuant thereto . . . ." 7 Am. Jur. 2d, *Auctions and Auctioneers* § 36. However, the Restatement does state that "[t]he power of the auctioneer and of his clerk to sign a memorandum as stated in Subsection (1) may be revoked by a buyer or seller at any time before the power is exercised." Restatement (First) of Contracts § 212.

---

[2] Under Idaho law, the *Holston* court's holding might be attacked as the memoranda under discussion arguably did not "plainly set forth the parties to the contract, the subject matter thereof, the price or consideration, a description of the property and all the essential terms and conditions of the agreement." *Hoffman*, 102 Idaho at 190, 628 P.2d at 221.

In short, the courts that have addressed this question have come to very different conclusions and they have not closely examined the interrelationship between the statute of frauds and the auction procedures. In considering whether the statute of frauds or common law principles of auctions prevails, we find that there is no general equitable principle that specifically exempts auctions (or auctions without reserve) from the requirements of the statute of frauds. There are two reasons for this conclusion. First, given the explicit statement of the legislature contained in Idaho Code § 9-503, there must be some recognized basis for ignoring the statute. Given the fact that there is no clear common law rule pertaining to the precedence of auctions over the statute of frauds, this tends towards a general recognition of the statute of frauds' applicability. Second, as Hagood notes, the cases that have recognized an exception to the statute of frauds have done so with little analysis, analogizing to the statutory rules governing auctions of personalty or requiring that the auctioneer sign a memorandum finalizing the sale, which did not occur in this case. We therefore conclude that the statute of frauds applies to auctions of land in the same manner as any other land transaction.

**B.      The Statute of Frauds Does Not Bar Enforcement of the Purchase and Sale Agreements.**

Wakelam and Ressler argue that the signed Representation Agreement, together with the documents generated at the auction, when considered together, constitute a sufficient writing to satisfy the statute of frauds. They point out that the Representation Agreement, which was signed by Hagood, contains all of the critical terms for the sale of the properties and that the auction documents flesh out the remaining details, including the purchase price and the identity of the buyers.

On the other hand, Hagood contends that no particular writing contains all of the necessary details of the sale and that the documents generated during and immediately after the auction cannot properly be incorporated into the Representation Agreement in order to satisfy the requirements of the statute of frauds. The district court agreed with Hagood, granting summary judgment in his favor.

A writing must contain all necessary "conditions, terms and descriptions" in order to comply with the statute of frauds. That does not mean, however, that every term of a contract for the sale of land must be specifically set forth in the writing itself. It is sufficient for an enforceable contract, including a contract for the sale of land, if the party to be charged agrees to

a definite method for determining a particular provision, such as the purchase price. "[A] contract must be complete, definite and certain in all its material terms, or *contain provisions which are capable in themselves of being reduced to certainty.*" *Giacobbi Square v. PEK Corp.*, 105 Idaho 346, 348, 670 P.2d 51, 53 (1983) (emphasis in original). Therefore, a seller can agree that, rather than stating a definite purchase price, the land sale contract provide a definite method to determine the purchase price, such as being established by an appraiser, by arbitrators, or by the successful bidder at an absolute auction. Similarly, the seller can agree that the identity of the purchaser will be determined by a definite method, such as the highest bidder at an absolute auction. Thus, while a sale of land is not taken outside the statute of frauds just because it involves an auction, the auction terms agreed upon by the seller, in a writing, can be considered in determining whether the writing satisfies the statute of frauds.

Wakelam and Ressler contend that the Representation Agreement constitutes a written offer, signed by Hagood, to sell each of his parcels of property[3] at absolute auction to the highest bidder and that all requisite terms of sale are contained in that writing. The Representation Agreement specifies, among other things:

> This property to be sold by auction Aug. 6th 2008 1:00 pm. Absolute sale. Owner to offer financing terms. Seller to pay advertising fee of $5,000. Buyer to pay a Buyer's premium fee of 5%. Houses included in sale—sold "as is where is" Seller understands the risk associated w/an absolute sale.

The Representation Agreement states that Hagood agrees to sell the property for a total price of "absolute sale @ auction." The absolute auction provisions make it clear that the purchase price and identity of the buyer will be established by the highest bid cast for each parcel at the auction.[4] With regard to the optional financing terms, the Representation Agreement specifies a 20% minimum down payment "and an acceptable secured note for the balance to be paid as follows: 8% Int. w/int. only payments Due in full 2 yrs." That is, in the event the buyer does not

---

[3] Hagood argues that the description of the property fails because it contains an incomplete description of the property. He points to incomplete zip code and street location information in the body of the Representation Agreement, while overlooking the attached legal descriptions and maps of the property. "An agreement for the sale of real property must not only be in writing and subscribed by the party to be charged, but the writing must also contain a description of the property, either in terms or by reference, so that the property can be identified without resort to parol evidence." *Ray v. Frasure*, 146 Idaho 625, 628, 200 P.3d 1174, 1177 (2009) (citing *Garner v. Bartschi*, 139 Idaho 430, 435, 80 P.3d 1031, 1036 (2003)). The failure to include the entirety of the zip code or street address does not render the property unidentifiable because the Representation Agreement references an exhibit containing maps and legal descriptions that accurately identify the properties.

[4] As noted above, an absolute auction, or auction without reserve, is an established legal concept, described in 7A C.J.S. Auctions and Auctioneers § 29. Neither party disputes that legal concept.

wish to pay the full bid price at the time of the auction, he has the option of making a 20% minimum down payment, with interest-only payments until two years from the auction date, whereupon the balance would be due and payable. The Representation Agreement requires the seller to pay a 5% brokerage fee, in addition to the buyer's 5% premium fee. The Representation Agreement authorizes the broker to list the property with the southwest Idaho multiple listing service, to advertise the property for sale in a variety of ways, and to spend $5,000 of the seller's funds to advertise the sale. Hagood specifically acknowledges the risks attendant to an absolute sale, indicating an understanding of what that terminology means. Thus, the Representation Agreement, which contains these terms and allows the broker to advertise them, constitutes an offer to the world, particularly those attending the auction, to sell the property and specifies that the highest bidder for each parcel will be able to unconditionally accept the offer by casting the successful bid. Because all terms necessary to satisfy the statute of frauds are contained in the Representation Agreement, there was no need in this case to resort to parol evidence in order to supply any missing term. *See Matter of Estate of Kirk*, 127 Idaho 817, 824, 907 P.2d 794, 802 (1995) (Where all documents purporting to transfer or convey real property to a trust were in writing and subscribed by the trustor and where the trust document supplied any terms not contained in the transfer documents so that no parol evidence was needed to supply any missing terms, there was no violation of I.C. § 9-503.)

It is uncontroverted that Hagood signed the Representation Agreement, authorizing an absolute auction of his properties on the terms therein stated and that all terms essential to a land sale contract were contained within that agreement. While the Representation Agreement did not specifically state the purchase price for any parcel or the name of the buyer or buyers who would submit the highest bid thereon, the agreement contained an appropriate provision for reducing those material terms to certainty. Therefore, the Representation Agreement does not offend the statute of frauds.[5] The district court erred in holding otherwise and we consequently reverse that holding.

---

[5] Contrary to Wakelum's and Ressler's contention, the documents generated at the auction do not figure into our statute of frauds analysis. None of them were signed by Hagood or an authorized representative, nor were they incorporated within the Representation Agreement. However, they are superfluous to our analysis in this case, as the Representation Agreement contained all of the required terms to satisfy the statute of frauds. There was no need here to look to parol evidence in order to supply a missing term. The documents may be considered, however, in determining whether or not Hagood's absolute action offers were properly accepted and, if so, whether or not the resulting contracts were performed.

The evidence in the record is without dispute as to the fact that Wakelam and Ressler accepted Hagood's offer to purchase on the terms contained in the Representation Agreement and that they tendered proper performance of those contracts. There is no contention that the auctioneer failed to conduct the auction in accordance with the authority granted by Hagood. It is agreed that Hagood did not revoke his authorization to sell the property. It is uncontested that Wakelam and Ressler were the high bidders, and that their bids were accepted by the auctioneer. Finally, it is uncontroverted that the essential terms contained in the Purchase Agreement were incorporated into the pre-prepared Purchase and Sale Agreements. Wakelam and Ressler both signed their respective Purchase and Sale Agreements, after having unconditionally obligated themselves to do so by virtue of having submitted their winning bids, thereby confirming their obligation to observe the terms of sale that Hagood was also obligated to honor by virtue of the Representation Agreement. Thus, enforceable sale agreements came into effect between the parties.

While not necessary to our analysis of the legal issues, some observations are in order. Hagood clearly understood that he would be stuck with the high bid made on each parcel at the auction and that there was no minimum, reserved price. Because he understood those facts, he tried both to cancel the auction and to set a minimum price but backed off because of the auctioneer's reaction. Hagood knew he could stop the auction at any time with regard to each parcel before the first bid was submitted on the same but failed to take action to do so. When presented with the Purchase and Sale Agreements at his deposition and asked if there were any terms, other than the purchase price, that were unacceptable to him, Hagood responded, "It was the price. Yeah." He was then asked, "Other than the price, everything is fine?" He responded, "Yeah." The only thing that kept the sales from being completed was Hagood's seller's remorse regarding the purchase price. Parties with the capacity to contract have the right to knowingly enter into financially unfortunate contracts, as well as lucrative ones, and cannot, without good cause, turn to the courts for redress when things do not work out as they had hoped.

## C.    Attorney Fees on Appeal.

Wakelam and Ressler seek attorney fees on appeal under Idaho Code § 12-120(3) on the ground that this case involves a commercial transaction. That code section provides for a reasonable attorney fee where a prevailing party has sought to recover in a commercial transaction. Although Wakelam and Ressler did not list the claim for attorney fees as a separate

issue for consideration on appeal, as required by Idaho Appellate Rule 35(a)(4), they did submit argument and authorities in a separate section devoted to that topic. Under such circumstances, we have relaxed the application of Rule 35(a)(4). *Everhart v. Washington County Road and Bridge Dept.*, 130 Idaho 273, 274, 939 P.2d 849, 850 (1997). Their argument for fees is well taken and, therefore, we award them their attorney fees on appeal under Idaho Code § 12-120(3).

## IV. CONCLUSION

We reverse the holding of the district court that the Representation Agreement is unenforceable for failure to comply with the statute of frauds. Wakelam and Ressler are awarded their costs and attorney fees on appeal. The case is remanded for further proceedings consistent with this opinion.


Chief Justice BURDICK, and Justices EISMANN, W. JONES, and HORTON CONCUR.